J-S07045-15

2015 PA Super 192

| IN THE INTEREST OF: D.C.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | |
| | No. 999 MDA 2014 |

Appeal from the Order Entered May 12, 2014
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000166-2013
CP-67-JV-0000720-2012

BEFORE: BENDER, P.J., OLSON, J., and OTT, J.

OPINION BY OTT, J.:                          **FILED SEPTEMBER 11, 2015**

The Commonwealth appeals from the order entered May 12, 2014, in the Juvenile Division of the York County Court of Common Pleas, terminating the delinquency supervision of minor, D.C.D. The juvenile court granted D.C.D.'s petition for early termination of his supervision to facilitate his transfer to Southwood Psychiatric Hospital. On appeal, the Commonwealth contends the juvenile court abused its discretion in granting D.C.D.'s motion when (1) other treatment options were available under delinquency supervision, and (2) the court failed to adequately consider the protection of the community. For the reasons that follow, we affirm.

We note at the outset that this is a unique case, involving the juvenile court's interpretation of Pennsylvania Rule of Juvenile Court Procedure 632,

under the specific facts of the matter before it. The pertinent facts are as follows. On October 15, 2012, a delinquency petition was filed against D.C.D., then age 10,[1] alleging he committed the crime of indecent assault[2] against his five-year-old sister and a three-year-old female cousin. On January 23, 2013, the charges were disposed of under a consent decree, and D.C.D.'s parents voluntarily placed him in foster care through Pressley Ridge Counseling. On April 11, 2013, D.C.D. was detained on new charges —stalking, loitering and prowling at night time, and harassment[3] — which arose after he sent notes of a sexual nature to an adult neighbor of his foster family. Following a hearing on April 22, 2013, and by agreement of the parties, the juvenile court added the charges of harassment and loitering and prowling to the consent decree,[4] and directed D.C.D. be placed with a new foster family.

On July 10, 2013, D.C.D. appeared before the juvenile court for a probation violation hearing. It was established that during a home visit on July 7, 2013, he attempted to set fire to a piece of wood in his bedroom. As a result of the hearing, D.C.D. was released to his foster home, and ordered

_____

[1] The child's date of birth is in March of 2002.

[2] 18 Pa.C.S. § 3126(a)(7).

[3] 18 Pa.C.S. §§ 2709.1, 5506, and 2709, respectively.

[4] The Commonwealth agreed to withdraw the charge of stalking.

to undergo a psychosexual evaluation.  At a subsequent review hearing on July 24, 2013, the parties agreed that York County Office of Children, Youth, and Families ("CYF") would conduct an investigation to determine whether D.C.D. should be adjudicated dependent.  CYF subsequently filed a dependency petition, and on August 7, 2013, the juvenile court adjudicated D.C.D. dependent.  The court specifically noted D.C.D. would be subject to "concurrent supervision" by both Juvenile Probation and CYF, but that CYF would be the lead agency.  N.T., 8/7/2013, at 14, 16.

On September 9, 2013, CYF filed a motion for change of D.C.D's placement because the child was continuing to act out sexually in his foster home.  Following a placement hearing on September 25, 2013, the trial court granted CYF's motion, and transferred D.C.D. to the Sarah Reed Residential Treatment facility ("Sarah Reed").

Thereafter, based upon D.C.D.'s continued violation of the terms of his consent decree, the juvenile court convened a hearing on the outstanding delinquency petitions.  *See* 42 Pa.C.S. § 6340(d).  On January 28, 2014, D.C.D. entered an admission to the charges of indecent assault and harassment by communication.[5]  Accordingly, the juvenile court adjudicated him delinquent, and directed that he remain at Sarah Reed.  On March 26,

---

[5] The Commonwealth withdrew the second charge of indecent assault, and the charge of loitering and prowling.

2014, CYF filed a motion for change of placement, asserting D.C.D. had sexually offended a younger child at Sarah Reed, and "was in need of a more specialized residential treatment program that would focus on the sexual offending issues."[6]  Motion for Change of Placement, 3/26/2014, at ¶ 9.  The motion also averred CYF and Juvenile Probation were recommending Southwood Psychiatric Hospital's Choices Program ("Southwood"), "which has immediate openings and is equipped to deal with the lower functioning youth."  *Id.* at ¶ 12.  During the March 31, 2014, placement hearing, counsel for CYF explained why the program at Southwood was the most appropriate placement for D.C.D.:

> First of all, they do specialize in sexual offending, sexual abuse issues and in addition they are able to facilitate treatment with those in the lower intellectual function and lower IQ range, which [D.C.D.] falls into, and they do have available, because they are associated with the Southwood Psychiatric Hospital that type of service as well.

N.T., 3/31/2014, at 5.  At the conclusion of the hearing, the juvenile court granted CYF's motion, and directed D.C.D. be transferred to Southwood.[7]

However, before the transfer was finalized, CYF learned Southwood would not accept children with an active adjudication of delinquency for a

_____

[6] CYF also noted that since D.C.D. had reached the age of 12, there were more placement opportunities for him.

[7] During the March 31, 2014, hearing, the attorney for the Commonwealth expressed her agreement with the recommendation of D.C.D.'s transfer to Southwood.  N.T., 3/31/2014, at 12.

sexual offense. Thereafter, on May 5, 2014, D.C.D. filed a motion for early termination of his court supervision pursuant to Pa.R.Juv.P. 632(F).[8] *See id.* (juvenile court may, for "compelling reasons," grant early discharge from supervision). The juvenile court conducted two hearings, the first on May 9, 2014, and the second on May 12, 2014. Following the second hearing, the court granted D.C.D.'s motion, and this timely appeal follows.[9]

The Juvenile Act, 42 Pa.C.S. § 6301, *et seq.*, governs the adjudication and disposition of delinquent and dependent children. With regard to delinquent children, the stated purpose of the Act is as follows:

> Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide **balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community**.

42 Pa.C.S.§ 6301(b)(2) (emphasis supplied). "The rehabilitative purpose of the Juvenile Act is attained through accountability and the development of personal qualities that will enable the juvenile offender to become a

---

[8] We note that D.C.D. originally filed a motion to vacate his adjudication of delinquency, but later withdrew that motion.

[9] On June 12, 2014, the juvenile court ordered D.C.D. to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). D.C.D. complied with the court's directive, and filed a concise statement on June 30, 2014.

responsible and productive member of the community." ***In re R.D.R.***, 876 A.2d 1009, 1013 (Pa. Super. 2005) (quotation omitted). The Act grants the juvenile court **broad discretion** in determining the **appropriate disposition** for a delinquent child, which this Court will not disturb "absent a manifest abuse of discretion." ***In re L.A.***, 853 A.2d 388, 394 (Pa. Super. 2004) (emphasis supplied). ***See*** 42 Pa.C.S. § 6352.

Pursuant to Pennsylvania Rule of Juvenile Court Procedure 631, the court may discharge a juvenile from delinquency supervision after the juvenile has satisfied all the conditions of his probation, that is, he has completed the terms of his dispositional order, he has paid in full all restitution, fines and costs, and he has not committed any new offenses. ***See*** Pa.R.J.C.P. 631 (A), (D). Rule 632, however, permits a juvenile court to order the early termination of court supervision. The Rule provides, in pertinent part:

**Rule 632. Early Termination of Court Supervision by Motion**

**A. Motion.** Any party may move for early termination of court supervision. The motion shall state with specificity why early termination is sought and why the requirements of Rule 631(A) have not been met.

**B. Notice.**

(1) In addition to the service requirements of Rule 345, any party moving for early termination shall serve the motion on the juvenile probation officer.

(2) The victim shall be provided notice of the motion for early termination of court supervision.

**C. Objection.**

(1) A party or the juvenile probation officer may object to the motion under paragraph (A) and request a hearing.

(2) Such objection shall be made within thirty days of the date of the motion; otherwise, objections are deemed waived.

**D. Court's determination.** The court shall:

(1) rule on the motion and any objections without a hearing; or

(2) schedule a hearing.

**E. Hearing.** If objections have been made pursuant to paragraph (C) and/or the court has determined a hearing is necessary, the court shall hold a hearing and give each party, the victim, and the juvenile probation officer an opportunity to be heard before the court enters its final order.

**F. Termination.** When the requirements of paragraphs (A) through (E) have been met **and the court is satisfied that there are compelling reasons to discharge the juvenile prior to the completion of the requirements of Rule 631(A), the court may order an early discharge of the juvenile from its supervision.**

Pa.R.J.C.P. 632 (emphasis supplied).

Accordingly, the juvenile court has the discretion to order early termination of a delinquent child's supervision for "compelling reasons." We note the Rule does not define what constitutes "compelling reasons," and our research has uncovered no appellate decisions interpreting Rule 632. The Merriam Webster Dictionary, however, defines "compelling" as "capable of causing someone to believe or agree[;] strong and forceful [;] causing you to feel that you must do something." http://www.merriam-webster.com/dictionary.

Here, the Commonwealth argues that no compelling reasons exist in the present case for the early termination of D.C.D.'s delinquency

- 7 -

supervision. It characterizes this matter as one involving "the unusual circumstance of a juvenile whose diagnostic indicators are so bad that few facilities are equipped to handle his problems." Commonwealth's Brief at 11. The Commonwealth asserts that, although the trial court determined Southwood was the **only** facility available to meet D.C.D.'s treatment needs, Juvenile Probation proposed two other treatment facilities, Mars Home and Abraxas Youth and Family Services ("Abraxas"), which would **not** require termination of D.C.D.'s delinquency supervision. Moreover, the Commonwealth contends the juvenile court focused solely on D.C.D.'s treatment and rehabilitation, to the exclusion of "the statutorily mandated goals of holding juveniles accountable and protection the community." *Id.* at 12. In fact, the Commonwealth notes the reason D.C.D. could not transfer to Southwood while under delinquency supervision is because the facility has a zoning agreement with its local community "based on not treating dangerous delinquent juveniles." *Id.*

The juvenile court, however, determined that D.C.D. presented compelling reasons for the early termination of his delinquency supervision, namely, his urgent need for the specialized care offered at Southwood. The court opined:

> D.[C.]D. is undeniably in need of specialized care: he has been both a victim and perpetrator of sexual abuse; he functions intellectually at a low level and is socially immature; he has exhibited fire-setting behaviors. These needs limit the placements available for appropriate treatment.

Sarah Reed, his placement at the time supervision was terminated, was inadequate for D.[C.]D.'s needs. Sarah Reed failed to provide him with adequate supervision and appropriate therapeutic services. In fact, the facility had ceased providing D.[C.]D. with the necessary therapy before his removal from their program and after just a few sessions. In order for D.[C.]D. to receive the necessary treatment, his immediate removal from Sarah Reed was imperative. One alternative placement capable of treating D.[C.]D. and available to take him immediately was identified.[1] Southwood Hospital, however, could not accept D.[C.]D. if he was actively adjudicated delinquent for a sexual offense. Without the active adjudication, D.[C.]D. could receive the treatment he needed; with the delinquency supervision, contrary to the purpose of the Juvenile Act, he would be precluded from immediately receiving appropriate treatment.

_____

[1] A second placement, Valley Youth House, had accepted D.[C.]D. at the time of the May 12, 2014 hearing, but the County had no contract with that facility. A third option, Abraxas Sexual Offender Open Program, had not yet accepted D.[C.]D. as of May 12, 2014, but even if it had, a bed was not available until the end of July or early August. Due to the lack of treatment D.[C.]D. received while at Sarah Reed, this Court found it was contrary to D.[C.]D.'s best interest to wait for admission into the program or for a bed at Abraxas.

_____

At the time of the hearing, D.[C.]D. was receiving no services particular to his adjudication of delinquency. **The services [the child] received were all as a result of his involvement with [CYF] as a dependent child.** Ceasing to monitor D.[C.]D. through delinquency court would have no, and in fact had no, effect on the judicial oversight of, or therapeutic services provided to, D.[C.]D.

**This Court's paramount concern is providing D[C.]D. with the treatment necessary to enable him to become a responsible, law-abiding citizen upon completion of treatment.** This Court acted within its discretion on May 12, 2014 when it terminated delinquency supervision pursuant to Rule 632 in order to permit D.[C.]D. to receive the appropriate

and necessary treatment at a facility that could address his needs.

Juvenile Court Opinion, 7/9/2014, at 3-5 (emphasis supplied).

After a thorough review of the record and the parties' brief, we detect no abuse of discretion on the part of the juvenile court in granting D.C.D.'s petition for early termination of his delinquency supervision. The Commonwealth does not dispute the fact that D.C.D. has not been receiving the treatment he needs at Sarah Reed. Rather, it points to the fact that there were two other treatment programs willing and able to care for D.C.D., neither of which would have required termination of his delinquency supervision. The Commonwealth also contends the court improperly focused solely on D.C.D's rehabilitative needs without adequately considering the need to protect the community.

With regard to the other treatment options, we find very little consideration was given to Mars Home as a viable treatment program for D.C.D. At the May 9, 2014, hearing, Mickeal Pugh, D.C.D.'s juvenile probation officer testified he made a referral to Mars Home, but learned the facility does not have a contract with Juvenile Probation. N.T., 5/9/2014, at 94. He also indicated he had never sent a juvenile to that program before. Further, Pugh testified that although Mars Home would address D.C.D.'s fire setting issues, "they're basically a sex offender treatment program." **Id.** Moreover, he did not indicate whether the program had any openings for D.C.D.'s immediate placement.

Conversely, the viability of Abraxas as an appropriate treatment facility for D.C.D. was thoroughly explored at the May 9, 2014, hearing. Lisa Front, admission liaison for the facility, testified the program "is specifically designed for fire setters, sex offenders[, and] has a fully-functioning special education department and emotional support department[.]" *Id.* at 128. However, she acknowledged the program would not have an opening for D.C.D. until July or August. *Id.* at 132. Moreover, Front agreed the "core population" of Abraxas was not "lower-functioning or borderline intellectual" individuals, although she testified that the facility had "successfully worked with kids with a wide variety of IQ's." *Id.* at 133, 138-139. Further, when asked whether Abraxas had accepted D.C.D. into its program, she replied the clinical team "felt he would be a good fit for the program," but acknowledged Abraxas did not offer the in-house occupational therapy that D.C.D. would require.[10] *Id.* at 141.

Jana Emig, a CYF caseworker supervisor, testified the Agency considered nine treatment facilities, including Abraxas, before recommending Southwood. With regard to Abraxas, Emig explained that CYF determined it would not be the best placement for D.C.D. because it did

_____

[10] Front did explain, however, that Abraxas would permit an outside provider to come into the facility and provide such services to D.C.D. N.T., 5/9/2014, at 141.

not have an immediate opening, and CYF was concerned about D.C.D.'s "lower functioning" intellect in the facility's general population.[11] *Id.* at 51.

However, with regard to Southwood, Emig testified: "It specifically specializes in children who have sexual abuse offending issues who are lower functioning." *Id.* at 53. Indeed, Southwood's Director of Admissions, George Lee, explained:

> We focus our program to deal specifically with sexually reactive youth in the age range that [D.C.D.] is in, who have experienced some form of trauma history, whether that be reactive attachment or something more severe along those lines, as far as trauma is concerned, and at the same time target youth with an IQ between 60 and 110, so everything I've read about [D.C.D.] qualifies him for the program.

*Id.* at 113.

Emig testified that D.C.D. is "taught at a lower grade level," and has social immaturity issues. *Id.* at 54. She emphasized the significance of D.C.D. receiving treatment suitable to his intellectual level:

> It's very important. Specifically for [D.C.D.], we have found out that [he] doesn't even understand what he is doing is wrong. There was also an understanding that when he had the incident in February, he had [stated] … that he ejaculated into the child's mouth, and in fact, he actually only had an erection, so not understanding what those terms meant and what his body was doing, he had no clue.

---

[11] During the May 12, 2014, hearing, D.C.D.'s counsel explained she was very familiar with Abraxas and had sent "multiple" children there, but that her "experience with the younger children that [have been placed there and that have] special needs has not been good." N.T., 5/12/2014, at 39. She stated "I'm just not convinced that they will be able to handle [him] at this point. I think he's too immature." *Id.* at 40.

… He did not fully understand what was going on [with his body].
*Id.* at 75.

Therefore, despite the feasibility of Abraxas as a potential treatment option for D.C.D., we cannot conclude the juvenile court abused its discretion in concluding that Southwood was the most appropriate treatment facility for D.C.D.'s specialized needs, and, therefore, compelling reasons existed to warrant the early termination of D.C.D.'s delinquency supervision.

The Commonwealth also argues, however, that the juvenile court focused solely on D.C.D.'s treatment needs without adequately considering "the statutorily mandated goals of holding juveniles accountable and protecting the community." Commonwealth's Brief at 12. It contends the victim of D.C.D.'s harassment adjudication opposed his early termination from supervision. Moreover, Southwood's zoning agreement with its local community prohibits the facility from treating "dangerous juvenile delinquents" like D.C.D. Commonwealth's Brief at 12. In support of this claim, the Commonwealth presented to the court a letter, dated September 16, 2013, from Southwood CEO Steve Quigley to North Strabane Township Manager Frank Siffrinn, which states that Southwood "do[es] not and will not accept children who have been adjudicated/or convicted of violent crimes." N.T., 5/12/2014, at 29. The Commonwealth argues "the Juvenile Court's slight of hand in hiding the dangerous nature of [D.C.D.] to get [him] into a non-violent offender program actually creates a greater risk to the community." *Id.*

Our review of the testimony of the harassment victim reveals that, while she opposed early termination of D.C.D.'s delinquency supervision, she was unaware that the treatment and supervision D.C.D. had been receiving was through CYF rather than through Juvenile Probation, and that the proposed treatment facility was a residential program in which D.C.D. would be supervised. *See* N.T., 5/12/2014, at 19-20. She also did not appear to understand that D.C.D. would continue to be monitored by the juvenile court. *See id.* at 24. Further, the victim testified:

> … I do hope that [D.C.D.] does get the help that he so desperately needs. I don't know the young man, but for him to – I can't imagine what he's going through, but for him to have behaved this way at such a young age, it scares me, and I hope he gets the help that he needs so that he can have a good life.

*Id.* at 27. By transferring D.C.D. to Southwood, the juvenile court was attempting to comply with the victim's request to "get [him] the help that he so desperately needs." *Id.* We do not find that the victim's "opposition" to the early termination of his supervision controlling.

Moreover, with regard to Southwood's purported zoning issue, the juvenile court credited the testimony of Mr. Lee, the program's admission director, who stated that D.C.D. **would qualify** for their program even though he had an adjudication of delinquency, if he was presently not under probation supervision. *See* N.T. 5/9/2014, at 121. We emphasize that whether D.C.D.'s admission into the program violates a zoning ordinance is a question for Southwood, not for the juvenile court.

We conclude the juvenile court made a fact-specific, reasoned, and difficult decision when it granted D.C.D.'s motion for early termination of his delinquency supervision. The court considered all of the relevant factors before concluding that D.C.D.'s need for the specialized treatment offered at Southwood outweighed his need to be supervised by juvenile probation. As D.C.D. notes in his brief:

> It was to the community's benefit for D.[C.]D. to be moved into appropriate treatment at Southwood. Southwood could provide treatment for D.[C.]D.'s issues on a level that he could understand and start to apply to his daily life rather than let [him] languish for months waiting for a bed in a facility that was not capable of treating his specialized issues.

D.C.D's Brief at 12. We agree. Although the effect of the court's ruling means that D.C.D. is no longer supervised by juvenile probation, he continues to be monitored both by CYF and the juvenile court. Moreover, he is being transferred to a secure, residential facility equipped to treat his particular mental health needs. Therefore, we find the court adequately considered all the goals of the Juvenile Act, including the protection of the community, before granting early termination of D.C.D.'s delinquency supervision.

Accordingly, because we find no abuse of discretion on the part of the juvenile court in concluding "compelling reasons" existed for the early termination of D.C.D.'s delinquency supervision, we affirm the order on appeal.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/11/2015