**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| IN THE INTEREST OF: D.C.D., A MINOR | : | No. 34 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the Superior |
| APPEAL OF:  COMMONWEALTH OF | : | Court at No. 999 MDA 2014 dated |
| PENNSYLVANIA | : | September 11, 2015 Affirming the Order |
| | : | of the York County Court of Common |
| | : | Pleas at No(s). CP-67-JV-0000720- |
| | : | 2012 and CP-67-DP-0000166-2013 |
| | : | dated May 12, 2014. |
| | : | |
| | : | ARGUED:  March 8, 2017 |


**OPINION**


**JUSTICE BAER**                                  **DECIDED:  October 18, 2017**

We granted review in this case to consider what constitutes a "compelling reason" for early termination of delinquency supervision under Pennsylvania Rule of Juvenile Court Procedure 632.[1]  After review, we conclude that the Superior Court properly determined that the juvenile court acted within its discretion in granting early termination to the juvenile in this case to allow him to obtain necessary and immediate treatment, after properly taking into account the three aspects of balanced and restorative justice (BARJ) embodied in the Juvenile Act and incorporated into the Rules of Juvenile Court Procedure: "the protection of the community, the imposition of accountability for offenses committed[,] and the development of competencies to enable

---

[1] The text of Rule 632, entitled "Early Termination of Court Supervision by Motion," is set forth in full *infra* at 6 n.8.

children to become responsible and productive members of the community." 42 Pa.C.S. §§ 6301(b)(2) ("Short title and purposes of chapter"), 6352(a) ("Disposition of delinquent child"); *see also* Pa.R.J.C.P. 101 (C) ("These rules shall be interpreted and construed to effectuate the purposes stated in the Juvenile Act, 42 Pa.C.S. § 6301(b)."). Accordingly, we affirm the Superior Court's judgment, which affirmed the grant of early termination of delinquency.

At the time of the May 2014 delinquency termination hearing at issue herein, D.C.D. was an intellectually low-functioning and socially immature twelve-year-old boy who was a victim of sexual abuse. To understand the factors at play in the delinquency termination hearing, we first consider D.C.D.'s history in the delinquency system. He originally entered the delinquency system in the fall of 2012, at age ten, due to allegations that he committed indecent assault[2] against his five-year-old sister.[3] Rather than formally adjudicating him delinquent at that time, the juvenile court entered a consent decree pursuant to 42 Pa.C.S. § 6340, which allows for the suspension of delinquency proceedings prior to formal adjudication, and placed D.C.D. in a specialized foster care program administered by Pressley Ridge.[4]

---

[2] 18 Pa.C.S § 3126(a)(7).

[3] D.C.D. was also accused of having committed indecent assault against his three-year-old cousin, but those charges were withdrawn by the Commonwealth in January 2014.

[4] The Juvenile Act defines a delinquent child as "[a] child ten years of age or older whom the court has found to have committed a delinquent act and is in need of treatment, supervision or rehabilitation." 42 Pa.C.S. § 6302. As noted, D.C.D. was ten years old at the time of the initial placement.

Prior to a formal adjudication of delinquency, the juvenile court and the parties may consider the less formal option of a "consent decree" which the Juvenile Act explains as follows:
(continued…)

In the spring of 2013, a few months after being placed in his first foster care home, D.C.D. was alleged to have left notes of a sexual nature for his foster care home's neighbor in regard to the neighbor's young daughter, which led to a charge of harassment by communication, an act of delinquency which also constituted a violation of his consent decree.[5] The parties agreed to allow D.C.D. to continue on the original consent decree but transferred him to a second foster home.

While on a home visit to his biological family in July 2013, D.C.D. allegedly attempted to start a fire in his room, which constituted another violation of the consent decree. Soon thereafter, in August of 2013, D.C.D. was found to be dependent due to his parents' inability to provide necessary care or control for reasons not directly related to the issues before this Court. In accord with the finding of dependency, the juvenile court transferred legal and physical custody to the York County Office of Children,

_____

(…continued)

> (a) General rule. - At any time after the filing of a petition and before the entry of an adjudication order, the court may, on motion of the district attorney or of counsel for the child, suspend the proceedings, and continue the child under supervision in his own home, under terms and conditions negotiated with the probation services and agreed to by all parties affected. The order of the court continuing the child under supervision shall be known as a consent decree.

42 Pa.C.S. § 6340(a). If the child fails to satisfy the terms of the consent decree, the original delinquency petition can be reinstated, 42 Pa.C.S. § 6340(d).

In this case, it appears that all parties agreed that the consent decree could not allow D.C.D. to remain in his own home given that his victim, who was his sister, also resided in that home. Accordingly, he was placed in specialized foster care through Pressley Ridge. Notes of Testimony (N.T.), 4/22/13, at 3.

[5] 18 Pa.C.S. § 2709(a)(4). Charges of stalking, 18 Pa.C.S. § 2709.1, loitering and prowling at night time, 18 Pa.C.S. § 5506, and summary harassment, 18 Pa.C.S. § 2709(a), were initially filed but later withdrawn.

Youth, and Families (CYF), which would serve as the lead agency, while Juvenile Probation continued to maintain concurrent supervision of D.C.D. pursuant to the consent decree.

In September 2013, following new allegations of inappropriate behavior while living in his second foster home, D.C.D. was removed from that home and temporarily placed in a respite foster care home and subsequently in the shelter care unit at the York County Youth Development Center. At the time, Pressley Ridge, D.C.D.'s foster care provider, indicated that it was unable to provide another foster care placement for him due to his history. Order of 9/11/13. Although the parties agreed that a residential treatment facility (RTF) was necessary for D.C.D., CYF had difficulty finding a bed for him in a RTF given that most of the providers offering services for juvenile sexual offenders and fire-starters did not treat children under twelve. Notes of Testimony (N.T.), 9/25/13, at 5. Indeed, D.C.D. remained in shelter care at the youth development center for nearly a month before being accepted and moved into the Sarah Reed Residential Treatment Facility. D.C.D. initially adjusted well to Sarah Reed and observed proper behavioral boundaries, other than a few incidents of not respecting other patients' personal space.

Nevertheless, given that the prior incidents involving the harassment and fire-starting constituted violations of his consent decree, CYF sought a combined placement review and dispositional review hearing, which was held in January 2014. At the hearing, D.C.D. was adjudicated delinquent as he admitted to the acts charged and because the court determined that he was in need of treatment and supervision pursuant to 42 Pa.C.S. § 6341. Specifically referencing the BARJ factors, the court concluded that continued residential treatment at the Sarah Reed facility was appropriate, as it would provide for community protection, while allowing D.C.D. to

develop competencies. Order of 1/28/14 at 4-6. The court also addressed accountability, the third prong of BARJ, by assessing various fees on D.C.D. *Id.* at 5.

In March 2014, the juvenile court held a hearing to address D.C.D.'s placement following a new allegation of a sexual incident involving a younger resident at Sarah Reed.[6] At that time, the parties recognized that more residential facilities were available to treat D.C.D. as he had turned twelve. However, some of the facilities were unwilling to accept children who had incidents of fire-starting, and others could not provide services for his level of intellectual functioning. Given the available options, the parties agreed that he should be moved to the Southwood Psychiatric Hospital - Choices Program (Southwood), a RTF which had a bed immediately available and which focused specifically upon his cohort: intellectually low-functioning, sexual offenders.

Despite the parties' agreement to place D.C.D. at Southwood, Southwood informed them that it could not accept him due to his adjudication of delinquency for a sexual offense. According to testimony from the Southwood director, Southwood had an agreement with the township in which it was located not to accept juveniles currently adjudicated delinquent for a sexual offense, but the director stated that they could accept D.C.D. if the delinquency supervision was terminated.[7]

---

[6] As of a subsequent hearing in May 2014, the parties indicated to the juvenile court that the Department of Public Welfare had investigated the incident but had not filed any charges as of the date of that hearing. *See* Order of 5/12/14 at 5-6.

[7] At a subsequent hearing, the parties disputed the exact nature and extent of Southwood's prohibition against juveniles who are adjudicated delinquent for sexual offenses. Based upon the Commonwealth's assertions during the hearing, the restriction at Southwood arose from an agreement between Southwood and North Strabane Township during the permitting process. N.T., 5/12/14, at 28. It was seemingly aimed at preventing Southwood from housing violent or drug-addicted juveniles. *Id.* at 29. The details of the agreement were not the focus of the hearing in this case; rather, the relevant uncontested fact was that Southwood agreed to take (continued…)

As a result, D.C.D.'s counsel filed a motion for early termination of delinquency supervision under Pa.R.J.C.P. 632,[8] to which the York County District Attorney objected

_____

(…continued)
D.C.D. only if he was not currently under delinquency supervision for a sexual offense. Order of 5/12/14 at 7.

[8] In full, Pa.R.J.C.P. 632, entitled "Early Termination of Court Supervision by Motion" provides:

> A. Motion. Any party may move for early termination of court supervision. The motion shall state with specificity why early termination is sought and why the requirements of Rule 631(A) [, *see infra* at 21 n.17 for full text,] have not been met.
>
> B. Notice.
>
> > (1) In addition to the service requirements of Rule 345, any party moving for early termination shall serve the motion on the juvenile probation officer.
> >
> > (2) The victim shall be provided notice of the motion for early termination of court supervision.
>
> C. Objection.
>
> > (1) A party or the juvenile probation officer may object to the motion under paragraph (A) and request a hearing.
> >
> > (2) Such objection shall be made within thirty days of the date of the motion; otherwise, objections are deemed waived.
>
> D. Court's determination. The court shall:
>
> > (1) rule on the motion and any objections without a hearing; or
> >
> > (2) schedule a hearing.

(continued…)

and requested a hearing. The court scheduled a two-day hearing in May 2014 to address D.C.D.'s dependency placement as well as the motion to terminate delinquency supervision. Prior to the hearing, the parties contacted at least nine potential facilities to attempt to find a suitable treatment facility for D.C.D, which would accept him while he remained "dual adjudicated", i.e., both dependent and delinquent.

At the hearing, all participants other than the District Attorney and Juvenile Probation officer favored termination of delinquency supervision to allow D.C.D. to be transferred to Southwood. In support of termination, D.C.D.'s CYF case manager detailed the various reasons why CYF had determined that Southwood was the only appropriate facility for D.C.D.[9] N.T., 5/9/14, 46-52, 75-76. The case manager revealed that a few of the facilities contacted refused to accept D.C.D. due to his fire-starting incident or his low IQ level, some facilities were geared toward older adolescent offenders who could prey upon D.C.D., and others did not have any available beds or did not provide the necessary level of supervision. One provider, Valley Youth House,

(…continued)

> E. Hearing. If objections have been made pursuant to paragraph (C) and/or the court has determined a hearing is necessary, the court shall hold a hearing and give each party, the victim, and the juvenile probation officer an opportunity to be heard before the court enters its final order.
>
> F. Termination. When the requirements of paragraphs (A) through (E) have been met and the court is satisfied that there are compelling reasons to discharge the juvenile prior to the completion of the requirements of Rule 631(A), the court may order an early discharge of the juvenile from its supervision.

[9] Additionally, D.C.D.'s former neighbor, who received the sexual notes regarding her daughter, testified telephonically during the hearing, indicating that she did not favor termination of delinquency but emphasized that she wanted D.C.D. to obtain the help that he needed. N.T., 5/12/14, at 27.

had a bed available but did not have a contract with York County. The CYF case manager testified that placing a child at a facility that did not currently have a contract with the county could take weeks or months because an agreement had to be negotiated between the county and the provider before D.C.D. could be placed. N.T., 5/9/14, at 80.

In contrast to these unacceptable facilities, the case manager explained the benefits of Southwood. She observed that it specialized in providing treatment to low functioning children with sexual abuse offending issues. N.T., 5/9/14, at 53. Southwood additionally provided treatment on campus which would mitigate the problems that arose at Sarah Reed where D.C.D. received only three sessions of sex offender treatment during the approximately six months he was there. N.T., 5/9/14, at 53, 60. She further emphasized that not all residential treatment programs can provide therapy to lower-functioning children, which she viewed as critical to D.C.D. who did not "even understand what he is doing is wrong" and did not "fully understand what was going on [with his body]." N.T., 5/9/14, at 75-76. She testified that she was not aware of any other program that focused on low-functioning juvenile sexual offenders like D.C.D. N.T., 5/9/14, at 78-79.

Testimony by the director of Southwood further supported D.C.D.'s placement at Southwood:

> We focus our program to deal specifically with sexually reactive youth in the age range that [D.C.D.] is in, who have experienced some form of trauma history, whether that be reactive attachment or something more severe along those lines, as far as trauma is concerned, and at the same time target youth with an IQ between 60 and 110, so everything I've read about [D.C.D.] qualifies him for the program.

N.T., 5/9/14, at 113.

D.C.D.'s juvenile probation officer testified in opposition to termination of delinquency, despite acknowledging that Southwood would be an appropriate placement. N.T., 5/12/14, at 31. As an alternative, he proposed the Abraxas Youth and Family Services Program (also referred to as South Mountain), which had two programs. One program was a secure residential facility for twelve to twenty-year-old residents, while the second program was an open (non-secure) residential program for twelve to fifteen-year-old juveniles. N.T., 5/9/14, at 90. He admitted that Abraxas only had a bed available immediately in the secure program aimed at older juveniles, and that the program appropriate for D.C.D. would not have a bed available for at least three months.[10] N.T., 5/9/14, at 90-91.

In closing, the Commonwealth urged the court not to terminate delinquency supervision. It contended that D.C.D.'s behavior had not improved since his delinquency adjudication such that termination of delinquency was unsupported. Instead, it argued that his inappropriate behavior was increasing, observing that he was being removed from Sarah Reed because of yet another incident. N.T., 5/12/14, at 32. The Commonwealth argued in favor of D.C.D.'s placement at Abraxas, asserting it could offer appropriate treatment services without requiring termination of delinquency supervision and was in closer proximity to D.C.D.'s family than Southwood, allowing for more family visits as well as other support services such as continued contact with his guardian *ad litem*, his probation officer, and CYF caseworkers. It further contended that Sarah Reed was an "appropriate" placement where he could remain until a bed became

---

[10] The CYF case manager had previously testified not only to her concern due to the lack of an immediate opening in the non-secure program at Abraxas, but also to her reservations regarding whether Abraxas would be appropriate for D.C.D. given that he would be a low-functioning twelve-year-old in a facility where twelve was the minimum age. N.T., 5/12/14, at 51.

available in the non-secure Abraxas program aimed at younger juveniles.[11] N.T., 5/12/14, at 35-36. The Commonwealth also averred that Southwood was a relatively unknown facility, with a cloud hanging over whether it would actually admit D.C.D. even if delinquency were terminated. N.T., 5/12/14, at 34. It further emphasized that if the court terminated delinquency supervision by Juvenile Probation, then it could not be reinstated absent D.C.D.'s commission of another act of delinquency. N.T., 5/12/14, at 34.

Counsel for D.C.D., in contrast, emphasized that all parties had agreed that Southwood was the best facility for D.C.D. a few weeks before the hearing. N.T., 5/12/14, at 36. She observed that CYF, rather than Juvenile Probation had been the lead agency in the case, meaning that termination of delinquency supervision would have minimal effect on the supervision of D.C.D. and the services offered to him, given that Juvenile Probation was not providing any services to him. Counsel also asserted that she doubted Abraxas' ability to care for a low-functioning juvenile offender at the younger end of the facility's age range. Additionally, counsel for D.C.D.'s mother, his guardian *ad litem*, and counsel for Children, Youth, and Families all argued in support of terminating delinquency supervision to allow D.C.D. to be placed at Southwood.

The juvenile court provided its decision at the close of the second day of hearings. The court recognized that the critical inquiry in the case was whether "compelling reasons" existed for early termination of delinquency for purposes of Pa.R.J.C.P. 632. The court observed that the term is not defined in Juvenile Court Rules or the Juvenile Act. Nevertheless, it reasoned that "[a] compelling argument or

---

[11] Notably, the Commonwealth was not suggesting placing D.C.D. in the older secure Abraxas program as it now proposes in its briefing to this Court.

reason is one that convinces someone that something is true or should be done." Order of 5/12/14 at 4.

The court then synthesized the difficulties of finding a proper placement for D.C.D. considering his treatment needs. The court observed that he was "undeniably in need of specialized care [because] he has been both a victim and perpetrator of sexual abuse; he functions at a low level and is socially immature; [and] he has exhibited fire-setting behaviors." Pa.R.A.P. 1925(a) Opinion at 3. The court emphasized the deficiencies in D.C.D.'s prior treatment. Specifically, it recognized that while Sarah Reed was the only facility able to treat D.C.D. in the fall of 2013 due to his age and treatment needs, it failed to provide the necessary treatment services. Order of 5/12/14 at 5. Indeed, the court found that "his immediate removal from Sarah Reed was imperative." Pa.R.A.P. 1925(a) Opinion at 3.

The court reviewed the testimony regarding the referrals made to other treatment facilities, observing that most were overtly inappropriate for D.C.D. or would not accept him due to his history or their lack of space. The court narrowed the options to three facilities. It first observed that Valley Youth House had accepted D.C.D., but the county did not have a contract with that facility. Order of 5/12/14 at 7. Although not specifically noted in the decision, testimony at the hearing suggested that the absence of a contract could delay placement of D.C.D. while the parties negotiated an agreement. N.T., 5/9/14, at 80. It is apparent from other portions of the juvenile court's decision that delayed treatment was unacceptable to the court given the paucity of proper treatment provided to D.C.D. up to the date of the hearing.

Next, the court considered Abraxas Sexual Offender Open Program. The court observed that the program aimed at younger offenders would not have a bed available for D.C.D. until at least July or August. Order of 5/12/14 at 7. As the court later

explained in its 1925(a) opinion, it concluded that the three-month delay in treatment would be contrary to D.C.D.'s best interest. Pa.R.A.P. 1925(a) Opinion at 4 n.1.

The court recognized that Southwood's director testified that D.C.D. would be unacceptable to the program so long as he was actively supervised as a delinquent child, but would be acceptable if he was only a dependent child. Order of 5/12/14 at 8. Considering all the factors, the court concluded that no compelling reason to terminate delinquency supervision would have existed if a bed had been available in the appropriate program at Abraxas. However, because there was no bed available until August, the court concluded that the only alternatives were to transfer him to Southwood or permit him to remain at Sarah Reed. The court had no hesitation in rejecting continued placement at Sarah Reed. Emphasizing that he had received only three sessions of outpatient sex offender therapy during his time at Sarah Reed, the court concluded that the facility could not provide effective treatment for D.C.D. and emphasized that it was "of grave concern to the [c]ourt that he remains in that facility despite the [c]ourt's ruling [in March] that it is not appropriate for his care." *Id.* at 9.

The court opined that its decision to terminate delinquency supervision was consistent with the purposes of the Juvenile Act, which provides for "balanced attention to the protection of the community, the imposition of accountability for offenses committed[,] and the development of competencies to enable children to become responsible and productive members of the community." 42 Pa.C.S. § 6301. Although the court did not specifically categorize its reasons for delinquency termination using the BARJ terminology identified in Section 6301, its reasoning on each factor can be discerned nonetheless. Indeed, the court recognized that competency development in the near term leads to community protection in the future as it observed that its "paramount concern" was to provide D.C.D. with the treatment needed to enable him to

become a responsible, law-abiding citizen upon completion of treatment. *See* Pa.R.A.P. 1925(a) Opinion at 4-5.

Similarly, the court addressed both community protection and competency development goals when it emphasized that D.C.D. would continue to be supervised by CYF, which had been acting as the lead agency in his care and supervision. Moreover, the court emphasized that it would continue to review the case on a regular basis to determine if placement was appropriate, a review which would again serve both protection and competency development functions. Order of 5/12/14 at 10-11. Moreover, the court directed D.C.D. to pay restitution, which it had previously imposed to satisfy the accountability prong of BARJ. Order of 5/12/14 at 11; *see also* Order of 1/28/12 at 5.

The court emphasized its concerns regarding the delay in providing D.C.D. needed treatment and indicated that the determination of compelling reasons for early termination hinged on the ability of D.C.D. to be transferred to Southwood within days of the order. The court directed that if D.C.D. were not transferred into the facility that same week, the court would reconsider its determination within the 30 days allowed for appeal. The court further indicated that if D.C.D. was not able to be placed at Southwood, then he should be transferred to Abraxas as soon as a bed became available.[12]

---

[12] Although not relevant to our review of the juvenile court's decision to terminate delinquency early, we observe that the final entry in the record provided to this Court indicates that D.C.D. was placed at Southwood pursuant to the court's order, where he was adjusting and progressing moderately as of July 2014. N.T., 7/7/14, at 28-29. Additionally, D.C.D.'s public defender in its brief to this Court states without record evidence that D.C.D. has been "returned home and removed from dependency supervision." D.C.D. Brief at 13 n.6.

The Commonwealth appealed the termination of delinquency to the Superior Court, raising the single assertion that the Juvenile Court erred in granting D.C.D early termination of delinquency supervision. Pa.R.A.P. 1925(b) Statement. The Superior Court summarized the Commonwealth's arguments as asserting that "the juvenile court abused its discretion in granting D.C.D.'s motion when (1) other treatment options were available under delinquency supervision, and (2) the court failed to adequately consider the protection of the community" by focusing exclusively on D.C.D.'s rehabilitation. *See In the Interest of D.C.D.*, 124 A.3d 736, 737 (Pa. Super. 2015).

In considering the Commonwealth's argument, the Superior Court recognized that Rule 632 allows for early termination of delinquency for "compelling reasons," despite the juvenile's failure to meet the usual requirements for termination of delinquency supervision under Rule 631, which include the juvenile completing the terms of his or her disposition order, paying restitution in full, and not committing any new offenses. Pa.R.J.C.P. 631, *infra* at 21 n.17. It observed, however, the neither the juvenile court rules nor caselaw have explained what constitutes "compelling reasons" for early termination. *In re D.C.D.*, 124 A.3d at 740.

After reviewing the testimony set forth above, the Superior Court opined that compelling reasons existed to warrant the early termination of D.C.D.'s delinquency supervision, given the limited placement options. The Superior Court rejected the Commonwealth's argument that the juvenile court insufficiently weighed the significance of the community protection and accountability factors of BARJ. Instead, it concluded that the juvenile court "considered all of the relevant factors before concluding that D.C.D.'s need for the specialized treatment offered at Southwood outweighed the need for his supervision by juvenile probation." *Id.* at 744.

The Superior Court additionally accepted D.C.D.'s argument that transferring him to Southwood to enable him to obtain appropriate treatment in fact benefitted the community in contrast to letting him "languish for months waiting for a bed in a facility that was not capable of treating his specialized issues." *Id.* at 744 (quoting D.C.D. Brief to the Superior Court at 12). Apparently addressing the consideration of community protection, the Superior Court further observed that D.C.D. would continue to be monitored by CYF and the juvenile court. The court, therefore, concluded that the juvenile court did not abuse its discretion in granting early termination of delinquency supervision because the court "adequately considered all the goals of the Juvenile Act, including the protection of the community."[13] *Id.* at 744.

Upon the Commonwealth's petition for allowance of appeal, this Court granted review to consider whether the Superior Court erred by concluding that the juvenile court did not abuse its discretion in granting early termination of delinquency supervision under Rule 632.[14] Essentially, the Commonwealth maintains that the

---

[13] The Superior Court cited long-standing precedent of that court holding that juvenile courts are afforded "broad discretion in determining the appropriate disposition for a delinquent child, which [appellate courts] will not disturb absent a manifest abuse of discretion." *In re D.C.D.*, 124 A.3d at 739 (internal citations omitted). The parties do not contest this standard of review, although they observe that appellate courts apply a *de novo* standard of review in construing and interpreting the language of the Juvenile Act and the Rules of Juvenile Court Procedure. *See, e.g., In the Interest of* M.W., 39 A.3d 958, 962 (Pa. 2012).

[14] We granted review of the following issue as stated by the Commonwealth:

> In interpreting Juvenile Court Rules 631 and 632; does a Juvenile Court abuse its discretion when it terminates delinquency supervision of a Juvenile Sex Offender early, despite also making a contemporaneous finding that the juvenile has a need for continued supervision and treatment requiring placement at a residential treatment facility based

(continued…)

juvenile court's finding of "compelling reasons" for delinquency termination did not appropriately balance the three factors of BARJ - accountability, community protection, and rehabilitation - which are incorporated into the Juvenile Act and the Juvenile Rules, as detailed in our analysis below. The Commonwealth contends that the lower courts weighed the rehabilitation factor too heavily and ignored the need for accountability and community protection.

Moreover, the Commonwealth maintains that the juvenile court should have considered the compelling reason for early termination in light of the factors relevant to standard delinquency termination set forth in Rule 631(a), which require satisfaction of the delinquency disposition order, payment of restitution, and no new offenses. Commonwealth Brief at 16. As applied to D.C.D., the Commonwealth emphasizes that D.C.D. had not met his treatment goals under the delinquency adjudication but instead was in need of increasingly intensive residential treatment to protect other patients and the community. Additionally, it observes that D.C.D. had not satisfied any of the restitution costs imposed on him. Rather than having no new offenses as required by Rule 631(a), the Commonwealth maintains that his progression of new offenses necessitated continued delinquency supervision rather than early termination. The Commonwealth emphasizes that terminating delinquency removed the District Attorney's Office and the Juvenile Probation Department from their role supervising D.C.D., which had the effect of eliminating the voices advocating for community protection and accountability. *Id.* at 12.

---

(…continued)
> upon the escalating violations of sexually offending other patients while in a different Residential Treatment Facility[?]

*In the Interest of D.C.D.*, 134 A.3d 50 (Pa. 2016).

In contrast, D.C.D. argues that the juvenile court acted within its discretion in granting D.C.D. early termination of delinquency supervision. He contends that the Juvenile Act's provision for "balanced attention" to the three BARJ factors does not require equal attention to each of the factors but instead grants the juvenile court discretion to fashion the appropriate disposition "to enable children to become responsible and productive members of the community." D.C.D. Brief at 35 (quoting 42 Pa.C.S. § 6301). He further recognizes that the three factors often overlap as the development of a juvenile's competencies through rehabilitation allows for their development into law-abiding citizens benefitting community protection.

As applied to this case, he emphasizes that community protection would be served by providing D.C.D. treatment for his special needs at Southwood, rather than leaving him to languish untreated at Sarah Reed or transferring him to Abraxas, which is geared to an older population. D.C.D. Brief at 16. D.C.D. further emphasizes that initial placement at the secure facility of Abraxas would have violated another purpose identified in Section 6301 of the Juvenile Act, which as noted below, requires courts to place delinquent children in the least restrictive facility. D.C.D. Brief at 39 (quoting 42 Pa.C.S. § 6301(b)(3)). He posits that, in granting termination of delinquency supervision to allow the transfer to Southwood, the juvenile court gave balanced attention to the protection of the community, accountability, and rehabilitation and honored the other purposes of the Juvenile Act.[15]

---

[15] The Defender Association of Philadelphia and the Juvenile Law Center file an *amici curiae* brief in support of D.C.D. in which they recognize that rehabilitation and community protection are not competing goals. They observe that allowing delinquent children to develop competencies enables them "to become responsible and productive members of the community, which in turn helps to protect the community from recurring criminal behavior." *Amici* Brief at 10 (internal quotation marks omitted).

In considering the issue presented by the Commonwealth, we first explore the structure of the delinquency provisions of the Juvenile Act and the related Rules of Juvenile Court Procedure. To begin, the General Assembly instructed that the Juvenile Act "shall be interpreted and construed as to effectuate" several purposes. 42 Pa.C.S § 6301. As relevant to the issues presented in this case, the Juvenile Act should be construed:

> Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to [1] the protection of the community, [2] the imposition of accountability for offenses committed and [3] the development of competencies to enable children to become responsible and productive members of the community.

*Id.* at (b)(2). The General Assembly also directed that courts use the least restrictive intervention consistent with community protection. 42 Pa.C.S. § 6301(b)(3)(i).

As these two Juvenile Act purposes demonstrate, the General Assembly incorporated "balanced and restorative justice", or BARJ, into the Juvenile Act via Act 33 of 1995 to achieve these articulated goals. 42 Pa.C.S. §6301(b)(2), (3). Historically, BARJ stemmed from the clashing methodologies of the retributive justice theory, which prioritizes punishment, and an individual treatment philosophy, which focuses on the rehabilitation of offenders. U.S. Dep't of Justice, Office of Juvenile Justice and Delinquency Prevention, *Guide for Implementing the Balanced and Restorative Justice Model* 1 (1998), https://www.ncjrs.gov/pdffiles/167887.pdf (hereinafter *Guide*); Gordon Bazemore & Mark Umbreit*, Rethinking the Sanctioning Function in Juvenile Court: Retributive or Restorative Responses to Youth Crime,* 41 Crime & Delinq. 296, 297-98 (1995). BARJ was a compromise in this long debate which brought together aspects of both systems by requiring consideration of community protection, accountability, and competency development. *Guide* at 1-2.

First, community protection focuses on decreasing the risk to communities and providing communities with tools to manage the behaviors of juvenile offenders. *Id.* at 27; *see* Patricia Torbet, Nat'l Ctr. for Juvenile Justice*, Advancing Community Protection: A White Paper for Pennsylvania* 4 (2008), *http://www.ncjj.org/PDF/whitepaper_commprotection.pdf.* BARJ aims to maintain community safety through developing short-term and long-term goals of changing and controlling juvenile offender behavior while developing mutual respect of citizens within the community. *Guide* at 27. Next, accountability recognizes that a combination of adhering to the rules of the legal system and accepting full responsibility for offensive behavior facilitates positive moral development. *Id.* at 9; Valerie Bender *et. al.,* Nat'l Ctr. for Juvenile Justice*, Advancing Accountability: Moving Toward Victim Restoration* 4 (2006), http://www.ncjj.org/PDF/whitepaper_victimrestoration.pdf. The accountability factor helps juvenile offenders to reduce their likelihood of re-offense through acknowledging that their behavior affects other people and creating opportunities for offenders to repair the harm. *Id.* Finally, competency development allows for juvenile offenders to forge skills that will allow them to contribute positively to the well-being of a community and ultimately allow offenders to gain a sense of belonging in a community. *Guide* at 19; *see* Patricia Torbet & Douglas Thomas, Nat'l Ctr. for Juvenile Justice*, Advancing Competency Development: A White Paper for Pennsylvania* 3 (2005), http://www.ncjj.org/PDF/whitepaperfinal.pdf*.*

With these overarching goals of BARJ in mind, we consider the applicable provisions of the Act in regard to delinquency supervision. We first observe that a juvenile must be older than ten years old to be subject to a delinquency adjudication and that the juvenile court must find beyond a reasonable doubt that the juvenile committed a delinquent act. 42 Pa.C.S. §§ 6302 (definition of "delinquent child" and

"delinquent act"); 6341(b). Additionally, an adjudication of delinquency is appropriate only if the court concludes that the child is in "need of treatment, supervision or rehabilitation." 42 Pa.C.S. § 6341. *See In the Interest of M.W.*, 39 A.3d 958 (Pa. 2012) (providing extensive discussion of the requirements of delinquency adjudication).

Disposition of a delinquent child is governed by Section 6352 of the Juvenile Act, which provides that a court's disposition should be "consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare." 42 Pa.C.S. § 6352. Moreover, reiterating the incorporation of BARJ into the Juvenile Act, Section 6352 additionally provides that the "disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community." *Id.*

A juvenile court has a variety of options available for placement of a delinquent child ranging from permitting the child to remain with his or her parents to committing the child to an institution.[16]   42 Pa.C.S. § 6352(a). However, "when confinement is necessary, the court shall impose the minimum amount of confinement that is consistent with the protection of the public and the rehabilitation needs of the child." *Id.* Additionally, the court may impose "fines, costs, fees or restitution" upon the child. 42 Pa.C.S. § 6352(a)(5).

---

[16] In contrast, 42 Pa.C.S. § 6351 provides for the disposition of a dependent child. As emphasized by the Commonwealth, this provision does not allow dependent children to be "committed to or confined in an institution or other facility designed or operated for the benefit of delinquent children," unless the child is also found to be delinquent. 42 Pa.C.S. § 6351(c).

The Pennsylvania Rules of Juvenile Court Procedure, in turn, implement the Juvenile Act and are "intended to provide for the just determination of every delinquency proceeding." Pa.R.J.C.P. 101. Moreover, the rules "shall be interpreted and construed to effectuate the purposes stated in the Juvenile Act," which as noted above, incorporates the three goals of BARJ: community protection, accountability, and rehabilitation. *Id.*

As relevant to the issues at bar, the Rules of Juvenile Court Procedure provide for termination of delinquency supervision in Rule 631.[17] Rule 631 obligates the

---

[17] Pa.R.J.C.P. 631 entitled "Termination of Court Supervision" provides:

> A. Notice. The juvenile probation officer shall promptly notify the court when the conditions of probation have been satisfied. The court shall decide if supervision should be terminated. The notice shall set forth:
>
> > (1) The juvenile has completed the terms of the court's dispositional order;
> >
> > (2) Restitution, fines, and costs have been paid in full; and
> >
> > (3) The juvenile has not committed any new offenses in which a criminal proceeding or proceeding governed by the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.,* may be commenced.
>
> B. Objection. Any party may object to the notice under paragraph (A) and request a hearing. Such objection shall be made within thirty days of receipt of the notice; otherwise, objections are deemed waived.
>
> C. Hearing. If objections have been made under paragraph (B), the court shall hold a hearing and give each party an opportunity to be heard before the court enters its final order.

(continued…)

juvenile's probation officer to notify the court when a "juvenile has completed the terms of the court's dispositional order;" has paid restitution, fines and costs in full, and "has not committed any new offenses." Pa.R.J.C.P. 631. The court may then terminate delinquency supervision if "the court is satisfied that the juvenile has carried out the terms of the dispositional order." *Id.*

As critical to the issues before this Court, however, the Juvenile Rules also provide for early termination without meeting the requirements of Rule 631. Rule 632 instructs that any "party may move for early termination of court supervision" but must "state with specificity why early termination is sought and why the requirements of Rule 631(A) have not been met." Pa.R.J.C.P. 632, *supra* at 6 n.8. Upon satisfaction of procedural requirements relating to notice and hearings, the court may order early termination of delinquency supervision if "the court is satisfied that there are compelling reasons to discharge the juvenile prior to the completion of the requirements of Rule 631(A)." Pa.R.J.C.P. 632(F). The comments to Rule 632 additionally reference Rule 515 which provides "procedures on the dispositional order." Extending the theme present in the Juvenile Act, Rule 515 again integrates BARJ by instructing that "the court shall issue a written order, which provides balanced attention to the protection of the community, accountability for the offenses committed, and development of the juvenile's competencies to enable the juvenile to become a responsible and productive member of the community." Pa.R.J.C.P. 515.

---

(…continued)

> D. Termination. When the requirements of paragraphs (A) through (C) have been met and the court is satisfied that the juvenile has carried out the terms of the dispositional order, the court may discharge the juvenile from its supervision.

With these directives from the Juvenile Act and the Rules of Juvenile Court Procedure in mind, we turn to the question at hand regarding whether the juvenile court abused its discretion in granting D.C.D. early termination of his delinquency supervision. As noted, the Commonwealth's overarching argument is that the juvenile court "failed to balance" the three factors of BARJ by granting excessive weight to D.C.D.'s rehabilitation without properly considering the protection of the community or D.C.D.'s accountability. Commonwealth's Brief at 11.

In its first sub-argument, the Commonwealth faults the juvenile court for "failing to weigh the 'compelling reason' [of Rule 632] against the factors implicated in Rule 631(a)," which the Commonwealth argues provide community protection by requiring the juvenile to complete the terms of the dispositional order and accountability by obligating the satisfaction of restitution. Commonwealth's Brief at 16. We respectfully disagree with this aspect of the Commonwealth's argument based upon the plain language of Rule 632. While a party's motion for early termination must state "why the requirements of Rule 631(A) have not been met," the Rule specifically provides that the court may "discharge the juvenile prior to the completion of the requirements of Rule 631(A)." Pa.R.J.C.P. 632(A), (F). Therefore, we reject the Commonwealth's suggestion to the extent it would necessitate a juvenile's compliance with Rule 631 when seeking early termination under Rule 632, which is applicable only when a juvenile has not met the requirements for standard termination under Rule 631.

The Commonwealth additionally argues that a juvenile court should not grant early termination of delinquency when the juvenile is still in need of "treatment, supervision or rehabilitation," which is the standard provided in the Juvenile Act for the initial adjudication of delinquency, 42 Pa.C.S. § 6341. We additionally decline to adopt this standard for early termination as it imposes restrictions that are not included in Rule

632, which is intentionally broad in that it requires only "compelling reasons to discharge the juvenile prior to completion of the requirements of Rule 631(A)," as discussed below.

The Rules, however, do not define "compelling reasons." We conclude that the absence of a definition serves the purpose of Rule 632, which provides the proverbial "safety-valve" necessary to allow juvenile courts to grant termination of delinquency for juveniles who do not meet the requirements of Rule 631. Thus, leaving the term "compelling reasons" undefined provides juvenile courts needed flexibility to address the varied and unanticipated needs of juveniles and the community. Nevertheless, we agree with the Commonwealth that "compelling reasons" should be viewed as encompassing the three goals of BARJ given the repeated invocations in the Juvenile Rules and the Juvenile Act of a balanced attention to community protection, accountability, and rehabilitation, as detailed *supra*. Accordingly, we view it incumbent upon this Commonwealth's juvenile court judges to consider specifically the three factors of BARJ when determining whether compelling reasons exist in the context of a motion for early termination of delinquency supervision, as with all other dispositions under the Juvenile Act.

Balanced attention to the three factors, however, does not require that the factors themselves be equally weighted in the ultimate decision. Instead, balanced attention merely requires the court to consider each factor. It may determine after consideration that one factor predominates in regard to the disposition of a particular juvenile. *See* Torbet, *Advancing Community Protection: A White Paper for Pennsylvania* at 2 (observing that "equal consideration is to be given to each goal at the beginning of [the court's] investigation," but acknowledging "that as fact-finding and assessment proceed,

the weight given to each goal will be balanced so that responses can be individualized.")

Indeed, as convincingly observed by *Amici*, the Juvenile Act itself notes a distinction in the weight attributable to the factors in Section 6352, which requires that a juvenile's delinquency disposition be "best suited to the child's treatment, supervision, rehabilitation and welfare" but merely "consistent with the protection of the public interest." *Amici* Brief at 9 (quoting 42 Pa.C.S. § 6352). Additionally, Section 6352 provides that the "disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention" to the three BARJ factors. Therefore, we emphasize that juvenile courts are granted broad discretion in weighing the BARJ factors as appropriate to the individual child. *See generally Commonwealth v. Cotto*, 753 A.2d 217, 222–23 (Pa. 2000) (finding constitutional the Juvenile Act's provision of "flexibility and discretion" rather than requiring "the rigid assignment of a specific weight to each of the factors to be considered" by courts faced with a motion to transfer a juvenile from adult court to juvenile court).

In the case at bar, we conclude that the juvenile court properly considered the relevant factors for early termination. It is clear that the juvenile court primarily focused upon the rehabilitation needs of D.C.D., given the failure of the "system" to provide D.C.D. necessary sexual offender treatment in his first eighteen months in the delinquency system. It is also apparent, however, that the court considered the need for community protection as the court considered only those facilities which could provide proper supervision, which would both protect D.C.D. from other patients as well as protecting other patients and the community from D.C.D. Indeed, the court rejected continued placement in the Sarah Reed facility because it "failed to appropriately supervise him or appropriately provide for his care to address his needs

therapeutically." Order of 5/12/14 at 9. We note that the two concepts are interrelated as proper treatment not only provides for rehabilitation but also affords protection for the community as it reduces the likelihood of re-offense. The juvenile court, additionally, addressed the accountability prong by not absolving D.C.D. of the previously imposed restitution requirements, which the court in its prior decisions had overtly imposed in regard to accountability.

As succinctly stated by *Amici*, compelling reasons for early termination of delinquency existed in this case because "D.C.D. needed a new placement immediately that could meet his therapeutic needs, and the only placement available required discharge of delinquency supervision." *Amici* Brief at 12. Indeed, the juvenile court emphasized that "[h]ad there been appropriate placement available at Abraxas … for immediate placement, there would be no compelling reason to consider." Order of 5/12/14 at 8. We conclude that the Superior Court properly determined that the juvenile court did not abuse its discretion in finding that compelling reasons existed to terminate delinquency supervision of D.C.D. to allow him to obtain immediate treatment given the absence of other facilities that could serve his needs. As time was of the essence in the treatment of D.C.D., we affirm the Superior Court's judgment.

Chief Justice Saylor and Justices Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.