J-E01006-19

2020 PA Super 115

| | | |
|---|---|---|
| IN RE: J.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: J.C. | : | |
| | : | No. 1391 WDA 2017 |

Appeal from the Order Entered July 5, 2017
In the Court of Common Pleas of Allegheny County
Juvenile Division at No(s): CP-02-JV-0001886-2011

BEFORE: PANELLA, P.J., BENDER, P.J.E., GANTMAN, P.J.E., LAZARUS, J., OLSON, J., KUNSELMAN, J., NICHOLS, J., MURRAY, J., and MCLAUGHLIN, J.

OPINION BY BENDER, P.J.E.: FILED MAY 13, 2020

Appellant, J.C., appeals from the order that granted the Commonwealth's request for involuntary inpatient treatment under the Court-Ordered Involuntary Treatment of Certain Sexually Violent Persons Statute ("Act 21"), 42 Pa.C.S. §§ 6401-6409.[1] Herein, J.C. challenges the constitutionality of Act 21, as well as the sufficiency of the evidence to support

_____

[1] Briefly, Act 21 directs the court to order involuntary inpatient treatment for a sexually violent delinquent child ("SVDC") if it finds, "by clear and convincing evidence[,] that the person has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence...." 42 Pa.C.S. § 6403(d). The order for involuntary inpatient treatment is reviewed annually, and may extend indefinitely if the individual continues to meet the criteria for involuntary inpatient treatment. See 42 Pa.C.S. § 6404. Additionally, once an individual is discharged from involuntary inpatient treatment, Act 21 requires the person to successfully complete at least one year of involuntary outpatient treatment before being discharged from treatment entirely. See 42 Pa.C.S. §§ 6404.1, 6404.2. For a detailed discussion of the rights and procedures set forth in Act 21, see In re H.R., --- A.3d ----, 2020 WL 1542422 at *1-3 (Pa. April 1, 2020) ("H.R. II").

the trial court's finding that he has a mental abnormality or personality disorder that makes him likely to engage in an act of sexual violence. After careful review, we affirm.

The trial court summarized the extensive history of this case as follows:

Before finding [then thirteen-year-old] J.C. delinquent, this court first — by stipulation of the Office of Children, Youth and Families ("CYF") and J.C.'s guardian — found J.C. dependent on April 9, 2010. J.C. was ordered to remain at Mel Blount Youth Home ("MBYH") in Washington County because: (1) he had no home and (2) his mother was unable to care for J.C. due to her health and his age.

While at MBYH, J.C. sexually assaulted another child and then admitted to the assault at a hearing on April 26, 2011, before the Washington County Court. The Washington County Court transferred the adjudicatory and dispositional hearings to this court. On November 7, 2011, this court adjudicated J.C. [delinquent] of one count of Indecent Assault,[1] deferred disposition, and detained J.C. at Shuman Center pending a mental health evaluation. On November 21, 2011, the [c]ourt again deferred disposition and ordered J.C. [to] remain detained with permission to place[,] consistent with the mental health evaluation recommendation and the availability of a bed[,] at Adelphoi Village (which occurred on November 25, 2011). J.C. was ordered to complete a sex offenders' program, and a commitment review was scheduled for April 9, 2011. Probation now shared responsibility for J.C.'s care with CYF.[2]

[1] 18 Pa.C.S.[] § 3126(a)(7), a (M1) at Petition T169017[,] case number CP-02-JV-1886-2011.

[2] The written commitment order was entered on November 29, 2011.

After J.C.'s initial secured commitment to Adelphoi [V]illage on November 25, 2011, the court conducted eight shared responsibility (or "dual" delinquency/dependency permanency placement) hearings prior to May 19, 2014. At his May 19, 2014[] dual hearing, the court found that J.C. had progressed sufficiently in the sex offender treatment program to permit transition to Adelphoi-SAL — a supervised[,] non-secure community, and

independent-living facility. J.C. was placed at Adelphoi-SAL on May 23, 2014. During J.C.'s placement at Adelphoi-SAL, his mother passed away — ending any chance for J.C. to return to his home. At the January 21, 2015 dual hearing, J.C. displayed moderate progress and was scheduled to graduate from high school on time. Probation and CYF's permanency plan for J.C. was to obtain full[-]time employment or part-time employment while being a full-time student. CYF was ordered to provide ongoing post-secondary college vocational planning and take J.C. on college tours. Additionally, he would still need a permanent place to live. The next dual review was scheduled for April 20, 2015.

On March 10, 2015, prior to the next review hearing, this court found that J.C. had failed to adjust ("FTA") at Adelphoi-SAL independent living because he was caught viewing pornography. J.C. was committed to Cove Prep for his second secure treatment program with a review scheduled for June 29, 2015.

J.C. remained at Cove Prep for the next eleven months and received extensive sex offender therapy. At J.C.'s January 25, 2016[] dual hearing, this court released J.C. to the unsecure community independent[-]living program based on his progress with sex offender therapy. For the next seven months, J.C. remained in the Auberle GOAL community independent[-]living program. During this time, he received outpatient sex offender relapse prevention therapy[,] in which he was permitted to gain employment, attend therapy sessions independently, and use public transportation.

Prior to an FTA petition being filed, J.C. was removed from the GOAL program and detained at the Auberle Delinquency Hartman Shelter for possessing an unauthorized cell phone and two computer memory sticks — one of which contained nude photos of underage boys. After a Detention/Shelter Hearing on August 22, 2016, this court ordered J.C. to remain detained at the secure Hartman Shelter.

On September 1, 2016, this court found that J.C. violated the terms of his probation by: (1) having possession of [two] memory sticks in his back pack and (2) failing to adjust at the Auberle GOAL program. This court modified J.C.'s disposition, released him from Auberle GOAL, and placed him at Cove Prep for his third secure sexual offender's treatment program. This court found that placement at Cove Prep was the least restrictive placement

— consistent with public protection — and best suited for J.C.'s treatment, supervision, rehabilitation and welfare.

J.C.'s public defender filed a petition for writ of habeas corpus relying on the plain language of 42 Pa.C.S.[] § 6353(a) (Limitation on and Change in Place of Commitment; General Rule), contending that J.C. had been illegally detained and, for more than a year, the court was legally obligated to release him from Cove Prep for lack of jurisdiction. Prior to J.C.'s dispositional review hearing on January 19, 2017, the court heard oral argument on J.C.'s habeas corpus petition[,] which it denied but agreed to reconsider after reviewing the parties' briefs. The court also conducted an Act 21 dispositional review hearing to determine whether a prima facie case for J.C.'s involuntary treatment existed under Act 21. This court found a prima facie case and ordered the County Department of Human Services to file an Act 21 petition. This court appointed attorney James Robertson to represent J.C. in the Act 21 proceedings.

The court also found that J.C. had made minimal progress toward alleviating the tendencies which necessitated the original placement because J.C. had recently authored graphic materials detailing sexual fantasies describing his attraction to young boys and vividly describing the genitals of young boys. The letters had been reviewed by both Cove Prep staff and Probation, and both agreed that the letters were not of a therapeutic nature and were intended for J.C.'s arousal.

Cove Prep and Probation both addressed their concerns to J.C. and re-directed him. At this point in the treatment process, therapy was concentrating on ability, or lack of ability, to control his attraction to young boys. J.C. admitted he has a serious issue and struggles daily with his attraction to young boys. He stated to probation he is unsure of his ability to control this attraction to boys while in the community. This court found that the current disposition provided balanced attention to the protection of the community, the imposition of accountability for offenses committed, and the development of competencies to enable the juvenile to become a responsible and productive member of the community. This court ordered J.C. to remain at Cove Prep.

The motion for reconsideration of his petition for [writ of] habeas [corpus] was denied on February 16, 2017, with the court adopting the Commonwealth's legal argument. On March 8, 2017, J.C.'s attorney filed a Motion to Certify Interlocutory Order for

Appeal of this reconsideration denial. This court granted that motion on April 7, 2017, finding that the case presents a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal will materially advance the ultimate termination of the matter.[3]

> [3] On July 24, 2017, the Superior Court of Pennsylvania granted J.C.['s] appeal of this court's interlocutory order dated February 16, 2017[,] denying J.C.'s petition for habeas corpus relief. The court filed its opinion to this appeal on August 29, 2017.

The court conducted a dual placement review and Act 21 hearing on June 27, 2017. At the hearing's conclusion, this court found by clear and convincing evidence that J.C. has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes him likely to engage in an act of sexual violence and otherwise meets all criteria necessary for continued commitment under Act 21, 42 Pa.C.S.[] § 6403. The court was statutorily bound to commit J.C. to the Pennsylvania Sexual Responsibility and Treatment Program at Torrance State Hospital ("Torrance") for a period of one year and not permitted any other treatment options. The court's only other option by law was to close his case and release him.

Trial Court Opinion (TCO), 10/17/17, at 1-6.

In an order entered July 5, 2017, pursuant to 42 Pa.C.S. § 6403(d), the trial court committed J.C. to the Sexual Responsibility and Treatment Program for a period of one year. However, the commitment was stayed for ten days in order to provide J.C.'s counsel time to file a motion for reconsideration. J.C. filed that motion, which the trial court denied on July 26, 2017.

J.C. timely appealed, and he also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court filed its Rule 1925(a) opinion on October 17, 2017.

On November 20, 2017, J.C. filed his appellate brief with this Court, raising a single claim that the trial court erred by finding clear and convincing evidence that he has a mental abnormality or personality disorder, and has serious difficulty in controlling sexually violent behavior. On January 23, 2018, the Commonwealth filed a responsive brief. On February 21, 2018, J.C. filed a motion to amend his brief in order to include an additional argument that his commitment should be construed as criminal punishment under the rationale of Commonwealth v. Muniz, 164 A.3d 1189, 1193 (Pa. 2017) (holding that the registration requirements set forth in the Sexual Offender's Registration and Notification Act ("SORNA"), 42 Pa.C.S. §§ 9799.10-9799.41,[2] are punitive and, thus, their retroactive application violates the ex post facto clause of the Pennsylvania Constitution). On March 5, 2018, this Court entered an order granting J.C.'s request to amend his brief, and the Commonwealth filed an answer thereto.

On December 10, 2018, a three-judge panel of this Court filed an opinion in this case holding that Act 21 is punitive and unconstitutional (hereinafter "J.C. I"). In doing so, the panel first assessed whether Act 21 is

_____

[2] Following Muniz and Commonwealth v. Butler, 173 A.3d 1212 (Pa. Super. 2017) ("Butler I"), discussed infra, the Pennsylvania General Assembly enacted legislation to amend SORNA, see Act of Feb. 21 2018, P.L. 27, No. 10 ("Act 10"). However, the Governor of Pennsylvania thereafter signed new legislation striking the Act 10 amendments and reenacting several SORNA provisions, effective June 12, 2018. See Act of June 12, 2018, P.L. 1952, No. 29.

punitive under the seven factors set forth in Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963).[3] Relying significantly on our Supreme Court's analysis of those factors in deeming SORNA punitive in Muniz, the J.C. I panel concluded that Act 21 also constitutes criminal punishment. The panel further held that, because Act 21 directs the trial court to employ a clear-and-convincing-evidence standard in determining whether the statute's provisions apply to an individual, it is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466 (2000) (holding that, other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proven beyond a reasonable doubt), and Alleyne v. United States, 570 U.S. 99, 106 (2013) (holding that "facts that increase mandatory minimum sentences must be submitted to the

_____

[3] The Mendoza-Martinez factors are as follows: (1) whether the statute involves an affirmative disability or restraint, see Muniz, at 164 A.3d at 1210; (2) whether the sanction has been historically regarded as punishment, id. at 1211; (3) whether the statute comes into play only on a finding of scienter, id. at 1213; (4) whether the operation of the statute promotes the traditional aims of punishment, id. at 1214; (5) whether the behavior to which the statute applies is already a crime, id. at 1216; (6) whether there is an alternative purpose to which the statute may be rationally connected, id.; and (7) whether the statute is excessive in relation to the alternative purpose assigned, id. at 1217.

jury" and found beyond a reasonable doubt).[4]  Accordingly, the J.C. I panel vacated J.C.'s commitment under Act 21.[5]

The Commonwealth filed a timely motion for reargument en banc.  On February 15, 2019, we granted that motion and withdrew our opinion in J.C. I.  J.C. subsequently filed a new appellate brief, as did the Commonwealth. Additionally, the Pennsylvania Office of Attorney General filed a brief as an intervenor in this case.  Oral argument before the en banc panel was conducted on May 29, 2019.

We now review the following two issues raised by J.C., which we reorder for ease of disposition:

> 1. Does 42 Pa.C.S. § 6403 ("Act 21") constitute punishment determined by a Muniz/Butler [I] analysis[?]
>
> 2. Did the [t]rial [c]ourt err in finding by clear and convincing evidence that J.C. has a mental abnormality or personality disorder and has serious difficulty in controlling sexually violent behavior?

_____

[4] In support of its holding, the panel relied largely on Butler I, which held that the sexually violent predator (SVP) requirements under SORNA are punitive under Muniz and, because the applicable burden of proof for the SVP determination is a preponderance of the evidence, it is unconstitutional under Apprendi and Alleyne.  As discussed infra, our Supreme Court recently reversed Butler I.  See Commonwealth v. Butler, --- A.3d ----, 2020 WL 1466299 (Pa. filed Mar. 26, 2020) ("Butler II").

[5] Notably, the J.C. I panel recognized that another panel of this Court had deemed Act 21 not punitive in In re H.R., 196 A.3d 1059 (Pa. Super. 2018) ("H.R. I").  However, the J.C. I panel declined to follow H.R. I, reasoning that it had not analyzed Act 21 under the Mendoza-Martinez factors, and the cases relied upon by the H.R. I panel to support its holding had predated the 2011 amendments to Act 21.

J.C.'s Brief at 9.

In J.C.'s first issue, he argues that this Court must hold that Act 21 is punitive in nature. J.C. insists that, "if [this] Court applies the test for punishment found in Mendoza-Martinez, used by the Muniz [C]ourt, the punitive nature of the statute becomes clear." J.C.'s Brief at 25. J.C. then goes through each of the Mendoza-Martinez factors, concluding that the first, second, fourth, and seventh factors weigh in favor of deeming Act 21 punitive; the third and fifth factors are irrelevant or of little weight to the analysis; and only the sixth factor favors deeming Act 21 as imposing only civil consequences. J.C. argues that on balance, Act 21 must be deemed punitive in intent and effect. From this conclusion, he contends that under Apprendi and Alleyne, and following the rationale of Butler I, Act 21's clear-and-convincing evidentiary standard must be deemed unconstitutional.

J.C. also avers that Act 21 violates his right to equal protection under the law because "Act 21 does not apply to adults who commit the same offenses." J.C.'s Brief at 30. Additionally, he insists that the statute violates his constitutional protections against double jeopardy and cruel and unusual punishment, as well as his "state and federal constitutional protection[s] against ex post facto laws." Id. at 33.

"At the outset, we note that our standard of review when considering [an] appellant's constitutional challenges is plenary, as these challenges involve pure questions of law." In re A.C., 991 A.2d 884, 890 (Pa. Super.

2010) (quoting Commonwealth v. Leddington, 908 A.2d 328, 331 (Pa. Super. 2006)).

> A statute will be found unconstitutional only if it clearly, palpably and plainly violates constitutional rights. Under well-settled principles of law, there is a strong presumption that legislative enactments do not violate the constitution. Further, there is a heavy burden of persuasion upon one who questions the constitutionality of an Act.

Id. (citation omitted).

After J.C. filed his appellate brief, our Supreme Court issued two key decisions that control the outcome of this case. First, in Butler II, the Court reversed our Butler I decision and held that the registration, notification, and counseling requirements imposed upon SVPs under SORNA are not punitive under a balancing of the Mendoza-Martinez factors. Butler II, 2020 WL 1466299, at *12-16. Consequently, the Butler II Court held that SORNA's requiring the trial court to decide whether an offender is an SVP by a preponderance of the evidence, rather than beyond a reasonable doubt, does not violate the due process principles announced in Apprendi and Alleyne. See id. at *16.

Shortly after Butler II, our Supreme Court issued H.R. II, which affirmed this Court's holding in H.R. I that Act 21 is also not punitive. In doing so, the H.R. II Court went through the Mendoza-Martinez factors and determined that — for reasons similar to those expressed in Butler II — only the first factor weighs in favor of deeming Act 21 punitive, while the other six

factors tip in favor of deeming the statute non-punitive.  H.R. II, 2020 WL 1542422 at *11-14.  On balance, the Court held:

> Despite the fact that Act 21 imposes obvious affirmative disabilities or restraints upon SVDCs, our review of the remaining Mendoza-Martinez factors leads to the conclusion the statutory scheme is not punitive in intent or effect.  Act 21 provides treatment to SVDCs rather than imposing restrictions that were historically considered punishment, and does not promote the typically punitive goals of deterrence and retribution.  Furthermore, Act 21 protects the public from SVDCs, who have never been convicted of a crime, but are subject to the statutory restrictions because they are dangerously mentally ill.  Lastly, Act 21, including the 2011 amendments, cannot be said to be excessive in light of the danger posed to the public by SVDCs.  Based on all of the above, we conclude that Act 21 does not constitute criminal punishment.

Id. at *14.

In light of Butler II and H.R. II, it is clear that J.C.'s constitutional challenges to Act 21 are meritless.  Like the SVP provisions of SORNA, Act 21 is not punitive under a balancing of the Mendoza-Martinez factors.  Thus, the statute's application of a clear-and-convincing-evidence standard for imposing its requirements on an individual is not unconstitutional under Apprendi and Alleyne.  Additionally, because Act 21 is not punitive, application of the statute does not violate J.C.'s constitutional protections against double jeopardy, cruel and unusual punishment, or ex post facto application of a penal law.

J.C.'s equal protection claim is also meritless.  He contends that Act 21 treats juveniles "worse than their adult counterparts by exposing them to consequences long after their adult counterparts have completed their

sentences." J.C.'s Brief at 31. J.C. also insists that "Act 21 does not survive a rational basis inquiry" because "no rational relationship exists to target juveniles who are protected by numerous statutes, while allowing adults to go free." Id. at 32. This Court rejected identical arguments in In re K.A.P., 9116 A.2d 1152, 1162 (Pa. Super. 2007). Because J.C. does not even acknowledge In re K.A.P., let alone offer any discussion of why we should overrule it, his equal-protection argument fails.

In J.C.'s second issue, he avers that the evidence was insufficient to support trial court's order to involuntarily commit him to inpatient treatment. Preliminarily,

> [w]e have explained that, at the [Act 21] hearing, it is the Commonwealth that bears the burden of showing by clear and convincing evidence that "the person has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence. If the Commonwealth meets this burden, the court is to enter an order committing the person to inpatient treatment for a period of one year." In the Interest of A.C., 991 A.2d 884, 889 (Pa. Super. 2010) (citations, quotation marks, and emphasis omitted). Our Supreme Court has defined clear and convincing evidence as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." In re R.I.S., … 36 A.3d 567, 572 ([Pa.] 2011) (citing In re Adoption of Atencio, … 650 A.2d 1064 ([Pa.] 1994)). Thus, the clear and convincing evidence test "has been described as an 'intermediate' test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt." Commonwealth v. Meals, … 912 A.2d 213, 219 ([Pa.] 2006). Moreover, "in conducting [a] sufficiency review, we must consider the evidence in the light most favorable to the Commonwealth, which prevailed upon the issue at trial." Id. at 218 (citing Commonwealth v. Sanford, … 863 A.2d 428 ([Pa.] 2004)). With regard to sexually violent predator

- 12 -

assessments, "[t]he task of the Superior Court is one of review, and not of weighing and assessing evidence in the first instance." Meals, 912 A.2d at 223.

In re S.T.S., Jr., 76 A.3d 24, 38-39 (Pa. Super. 2013).

Here, the trial court summarized the evidence presented at the Act 21 hearing on June 27, 2017, which it found sufficient to necessitate the involuntary commitment of J.C.:

> [T]his court considered the testimony from, Norman Wesolowski ("Mr. Wesolowski"), Dr. Robert Stein ("Dr. Stein"), Dana Evangelista ("Ms. Evangelista"), Matthew Stewart ("Mr. Stewart"), and Dr. Alice Applegate ("Dr. Applegate").
>
> Mr. Wesolowski, an Allegheny probation officer, was the first to testify. Mr. Wesolowski has been a probation officer for 18 years[,] with the past 10 years working in the Special Services Unit (the "SSU") — a unit that specializes in sexual offenders. Mr. Wesolowski testified that he had been J.C.'s probation officer since the inception of J.C.'s case with probation in 2011[,] and has had face-to-face and telephone contact with J.C. at least monthly. During the course of this case, J.C. has been in several different placements ranging from secure to independent living—all of which provided sex offender treatment. Mr. Wesolowski testified that both times J.C. was placed in unsecure independent living[,] he was found to be either in possession of or viewing child pornography[,] which resulted in two founded FTA adjudications. See [N.T.,] 6/27/2017[,] ... 37-44. Mr. Wesolowski testified J.C. would benefit from an Act 21 commitment as follows:
>
>> I believe [J.C.] needs to be committed [pursuant] to Act 21 and I'll explain why. Specifically, he hasn't displayed the ability to apply the treatment principles that he has learned in treatment in the community. Not once, but twice he's been in independent living programs, and we've had serious breaches and violations of probation, if not FTA, definitely violations of probation. My concerns stem from [the fact that] [J.C.] hasn't ... demonstrated the ability to control himself. He doesn't have the internal skills that I would say are needed to control his urges in the community, and I base that ... on ... the years that I've known him, [and that] he's had pretty good treatment teams, he's had pretty good

... treatment in all the placements that he's been, and once he had the opportunity as the supervision would lessen as he progressed, he would relapse and he would commit offenses that were violations of probation, specifically what we discussed, and he's went to some great lengths to manipulate to be able to do that. It wasn't like he wasn't under any supervision at all. He was under supervision in the independent[-]living programs, fairly good supervision, not the type of supervision he was [under] in a secure treatment facility, of course. He managed to find a way to violate the conditions of his supervision.

[Id. at] 56-57.

The next witness to testify on behalf of the [Commonwealth] was Dr. Stein, a member of the SOAB. Dr. Stein reviewed J.C.'s records and prepared the amended assessment report. Dr. Stein, concluded after a review of J.C.'s records that J.C. has a pedophilic disorder, see [id. at] 78-79, and met the criteria for involuntary commitment under Act 21. Dr. Stein testified as follows when asked for his conclusions after reviewing J.C.'s file for the Act 21 Assessment:

[W]ell, that brings up the next section, which is the middle paragraph on page five, which is the issue of serious difficulty in controlling sexually violent behavior. We noted the progress and treatment over time, that [J.C.] is an intelligent young man, learns the treatment protocols, learns how to do safety plans and learns relapse prevention skills and noted that he had achieved successful discharge from more restrictive programming, but despite this, understanding of principles of risk management, he has repeatedly engaged in high-risk behavior, that is, possession of child pornography. Such access of child pornography basically reinforces the sexual interest in children. The February 2015 and August 2016 child pornography matters occurred while under the supervision of treatment programs and following years of treatment. It's also noted that in the community possession of child pornography is a felony and is considered, whether a misnomer or not, a sexually violent offense under the SVP, under the [SORNA] criteria. These acts indicate an inability or an unwillingness, we can't know for sure, to manage sexual urges and in my opinion places him at high risk to reoffend in an unsupervised community.

[Id. at] 80-81.

Dr. Stein also testified that if J.C. were to be placed unsupervised in the community, he would be at a high risk to reoffend by viewing child pornography and, if left alone with a child unsupervised, would be placed at high risk of a hands-on offense. [Id. at] 95. Dr. Stein recommended that J.C. be involuntary committed to the Act 21 facility at Torrance. [Id. at] 83. The court also notes that all of Dr. Stein's opinions and testimony were rendered to a degree of professional certainty. [Id. at] 85.

The [Commonwealth's] third witness was the clinical service manager at Cove Prep during both of J.C.'s commitments at Torrance, Ms. Evangelista.[4] Ms. Evangelista testified that Cove Prep was a 5[-l]evel secure sex[-]offender facility that has surveillance, locks on doors that require keys, and supervision 24/7. [Id. at] 97-98. During J.C.'s stays at Cove Prep, Ms. Evangelista spoke with him daily. Ms. Evangelista testified that during J.C.'s second stay[,] his therapy progress was stagnant and the facility staff found graphic written materials in his "fun box." [Id. at] 100-105. On cross[-]exam[ination] by J.C.'s attorney[,] Ms. Evangelista stated that in her five years at Cove Prep, J.C. was the first resident that had completed the program [and then had] to return, based on a serious probation violation, to repeat their program. [Id. at] 108-09.

[4] J.C. was committed to Cove Prep at the time of the Act 21 hearing on 6/27/2017.

The [Commonwealth's] last witness was Mr. Stewart, J.C.'s individual and group therapist since September 2016 at Cove Prep. Mr. Stewart testified that J.C. admitted to him that he had authored the inappropriate written materials found in his fun box[,] and that the content of the stories was concerning because viewing child pornography was part of his offense cycle. Mr. Stewart provided his opinion based on his observations and interactions with J.C.[,] and not any confidential disclosures[,] that he believed that J.C. would present a high risk to re[-]offend without additional supervised sex[-]offender treatment. [Id. at] 122-23.

Even J.C.'s own expert, Dr. Applegate, admitted on cross[-]exam[ination] that J.C. had a diagnosis of provisional pedophilic

disorder.[6]    Dr. Applegate also conceded that J.C.'s recent possession of written materials he wrote, which were … detailed[,] first[-]person accounts of his sexual fantasies with young children, would meet the definition of a pedophilic disorder.  Dr. Applegate's exculpatory explanation that J.C.'s creation and viewing of child pornography should be discounted because J.C. did not legally understand the serious[] nature of his actions confirms that J.C. needs involuntary treatment provided by Act 21.    When questioned by the court if J.C. had a serious difficulty controlling his sexual[ly] violent behavior[,] Dr. Applegate testified that she did not think that he had a serious difficulty at this time[,] but had difficulty which would require the right support system around him.  [Id. at] 157-62.  The court also notes that Dr. Applegate's testimony and opinions were expressed to a degree of scientific certainty.  [Id. at] 206.

TCO at 9-13.

Based on the court's summary of the evidence, which is supported by the record, we agree that it "did not err in finding clear and convincing evidence that J.C. has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes him likely to engage in an act of sexual violence."  Id. at 14.  In challenging the court's determination, J.C. essentially avers that the court should have placed more weight on Dr. Applegate's testimony than the opinion of Dr. Stein. However, as stated supra, our scope of review does not permit us to reweigh and reassess the evidence in the first instance.  See In re S.T.S., Jr., supra.

In any event, J.C.'s attacks on the weight the court afforded to Dr. Stein's opinion are unconvincing.  For instance, he contends that Dr. Stein's

_____

[6] Dr. Applegate explained that "provisional pedophilic disorder" means that she saw signs of pedophilic disorder in J.C., but she had not "seen everything to make a clear diagnosis at this point."  N.T. at 146.

testimony should have been disregarded by the court because the doctor did not conduct an examination of J.C. but, instead, based his report on the written documents contained in J.C.'s file. J.C.'s Brief at 15. However, J.C. concedes that Dr. Stein's failure to examine him was "due to [J.C.'s] counsel's decision to decline an interview." Id. at 14. As the Commonwealth aptly observes, J.C.'s

> argument suggests that any juvenile offender who wishes to evade the consequences of Act 21 can do so by refusing to participate in the SOAB assessment. Such an absurd result could not have been intended by the legislature when Act 21 was enacted. In any event, Dr. Stein testified that he frequently conducts Act 21 assessments using only the case file.

County Solicitor's Brief at 51 (citing N.T. at 72). We agree, and find J.C.'s challenge to Dr. Stein's expert opinion to be meritless.

J.C. also fails to convince us that Dr. Stein's testimony should have been disregarded because, "[w]hile Dr. Stein opined that J.C. would have serious difficulty controlling his sexually violent behavior, ([N.T. at 85])[,] he agreed with Dr. Applegate that J.C.'s treatment needs could be met [in] a long-term residential placement instead of through Act 21." J.C.'s Brief at 17. The fact that Dr. Stein agreed that J.C.'s therapeutic needs could possibly be met through other means — such as a commitment under the Mental Health Procedures Act (MHPA), 50 Pa.C.S. § 7301 et seq. — has no bearing on our assessment of whether the evidence was sufficient to sustain his involuntary commitment under Act 21.

Finally, J.C. claims that the evidence was insufficient to support his commitment because the Commonwealth "failed to produce evidence at the Act 21 hearing that J.C. had touched anyone inappropriately since his delinquency adjudication." Id. at 17. We rejected a similar argument by the appellant in In re R.Y., Jr., 957 A.2d 780, 786 (Pa. Super. 2008). There, we found it inconsequential that R.Y. had not committed a sexual offense since the underlying crime, as he had "been placed in various restrictive environments where the likelihood of re-offending [was] significantly lessened." Id. The same is true here — since J.C. was adjudicated for his underlying offense in 2011, he has predominantly been detained in secure facilities, thus lessening his ability to re-offend. Moreover, on the two occasions that J.C. was moved into less secure, independent-living facilities, he was caught viewing or possessing child pornography. Thus, the fact that J.C. has not touched any child inappropriately since his original offense does not convince us that the court erred in finding that he poses a high risk of re-offending if released.

In sum, viewing the evidence in the light most favorable to the Commonwealth, we conclude that it sufficiently established that J.C. has a mental abnormality or personality disorder that causes him to have serious difficulty controlling sexually violent behavior, and makes him likely to engage in an act of sexual violence if released. Dr. Stein opined that J.C. has pedophilic disorder, and that J.C.'s repeated, 'high-risk behavior' of viewing child pornography while in supervised treatment indicates his inability or

unwillingness to manage his sexual urges, and demonstrates that J.C. poses a high risk of re-offending. Dr. Stein's opinion was supported by the testimony of Mr. Wesolowski, Ms. Evangelista, and Mr. Stewart, as well as the evidence that J.C. authored graphic material vividly detailing his sexual fantasies involving young boys. Based on this record, the evidence was sufficient to establish the elements necessary to involuntarily commit J.C. under Act 21.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/2020