J-S06011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| L.C. | : | |
| | : | |
| Appellant | : | No. 1211 EDA 2020 |

Appeal from the Order Entered March 5, 2020
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-JV-0000337-2013

BEFORE:   PANELLA, P.J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PANELLA, P.J.:                    Filed: May 13, 2021

L.C. appeals from the order entered in the Montgomery County Court of Common Pleas, which, following an Act 21 hearing, involuntarily committed him pursuant to 42 Pa.C.S.A. § 6403(d). On appeal, L.C. challenges whether the juvenile court erroneously denied his petition for early termination of court supervision. Moreover, L.C. contends that the juvenile court erred in finding there was clear and convincing evidence necessitating his involuntary commitment. As we see no merit to either claim, we affirm the juvenile court's order.

While the facts and procedural history of this matter are lengthy and somewhat complicated, we glean the following from the record in conjunction with the submitted briefs. Approximately eight years ago, the court

---

* Retired Senior Judge assigned to the Superior Court.

adjudicated L.C. delinquent after he admitted to committing indecent assault, pursuant to 18 Pa.C.S.A. § 3126(a)(7). After this disposition, he was placed in several treatment facilities for various periods of time, failing to adjust in each circumstance.

Eventually, L.C. settled into South Mountain Secured Treatment Unit ("South Mountain") for over five years. At South Mountain, L.C. was diagnosed with attention deficit hyperactive disorder, oppositional defiance disorder, being a sexual abuse perpetrator, and being a sexual abuse victim. Even given his long stay at South Mountain, L.C. was not able to make any demonstrable progress on alleviating his illicit sexually related proclivities, and while in that placement, he was arrested multiple times on adult charges.

Ultimately, the Sexual Offenders Assessment Board ("SOAB"), pursuant to 42 Pa.C.S.A. § 6358(f) in tandem with § 6403(b), assessed L.C., resulting in a recommendation of involuntary commitment. In concluding that L.C. suffered from mental abnormalities, a SOAB member/expert witness testified that L.C. suffered from two paraphilic disorders, exhibitionistic disorder and frotteuristic disorder.[1] However, she premised her findings exclusively on L.C.'s juvenile probation and placement records.

From these findings, the juvenile court concluded that a *prima facie* case

---

[1] The SOAB member defined exhibitionistic order as "a deviant sexual arousal to non-consensual exhibiting of one's genitals or sexual behavior to a victim." N.T., Act 21 Hearing, 2/26/20, at 8. Likewise, she identified frotteuristic disorder as "non-consensual rubbing of another's genitals or your own genitals against a victim." **Id**.

had been made under Act 21 for involuntary commitment and directed the Commonwealth – in this case, the Montgomery County Solicitor's Office – to file a petition for involuntary commitment. Concurrent with the Commonwealth filing its petition, L.C. filed a petition for early termination of court supervision, which the court denied.

At the involuntary commitment hearing, which took place over a four-day period, the Commonwealth presented the same SOAB representative's testimony. At this point, she indicated that both conditions L.C. suffered from would last for his entire life and that L.C. had a high likelihood of re-offense. After the hearing, the juvenile court simultaneously involuntarily committed L.C. for a period of one year and terminated juvenile supervision of this matter, effective on the date of his twenty-first birthday.

L.C. filed a timely notice of appeal, and all parties have complied with their respective obligations under Pa.R.A.P. 1925. L.C. raises two issues for our consideration:

> 1. Did the lower court err in denying L.C's petition for early termination of court supervision given his long placement time, failure of those placements to meet their treatment obligations, attainment of a high school equivalency diploma, and competition of all educational and vocational programs offered at his most recent placement?
>
> 2. Did the lower court err in finding that there was clear and convincing evidence L.C. required court-ordered involuntary treatment?

*See* Appellant's Brief, at 3.

Preliminarily, we note our long-standing precedent when considering

juvenile court matters: absent an abuse of discretion, those courts are afforded broad discretion in crafting an appropriate disposition for a delinquent child. *See In the Interest of D.C.D.*, 171 A.3d 727, 736 n.13 (Pa. 2017). However, we, as an appellate court, apply a *de novo* standard of review when construing the Juvenile Act and its procedures. *See id*.

In his first issue, L.C. asserts that this case is controlled by our Supreme Court's holding in *D.C.D.* In *D.C.D.*, the delinquent juvenile filed a motion for early termination of delinquency supervision, which was granted by the juvenile court. *See id*., at 731-32, 735. The juvenile court terminated delinquency supervision of D.C.D., finding that there was a lack of adequate placement options for D.C.D. On appeal, the Supreme Court of Pennsylvania approvingly cited the juvenile court's actions and held that the primary focus under these circumstances is the rehabilitative needs of the juvenile. *See id*., at 738, 742. The Supreme Court then went on to indicate that the juvenile court correctly addressed the need for community protection and additionally properly ascribed accountability to the juvenile's underlying offenses. *See id*., at 742.

Other than his terse reference to *D.C.D.*, L.C. cites no further cases nor statutory authority. In fact, L.C. only utilizes two pages of text to make his argument. He contends, however, that *D.C.D.* compels a reversal of the juvenile court's denial of his petition for early termination. He challenges the court's finding that he "failed to show positive adjustment at any of his

placements and had clearly exhausted all alternatives in the delinquency system at the time his [p]etition for [e]arly [t]ermination was filed." Appellant's Brief, at 13. Moreover, L.C. presents several factual similarities between the juvenile in **D.C.D.** and himself, such as their respective IQs and the ages when they were adjudicated dependent for the same offense. **See id**. Finally, L.C. asserts he has effectively reached the endpoint of the educational and vocational opportunities available to him under his supervision by the juvenile court system. **See id**.

Initially, we note that it is unclear whether the juvenile court's order denying L.C.'s petition for early termination of court supervision, filed separately from the juvenile court's adjudication of L.C.'s Act 21 proceedings, constituted a separate, yet final, appealable order. "It is a fundamental principle of law that an appeal will lie only from a final order unless otherwise permitted by rule or statute." **Puricelli v. Puricelli**, 667 A.2d 410, 412 (Pa. Super. 1995). Absent an appealable order, we lack jurisdiction to review an appellant's underlying claims. **See id**.

Therefore, if denial of L.C.'s petition for early termination was a final order, we lack jurisdiction to review that denial. Clearly, the grant of such a petition constitutes a final order. **See D.C.D.** However, it is not so clear that an order denying early release is automatically a final, appealable order. In spite of this ambiguity, we need not reach this thorny issue, as we conclude that under the specific circumstances of this case, the order denying L.C.'s

petition for early termination was not separable from the already existing Act 21 proceedings.

The Commonwealth initially instituted Act 21 proceedings in August of 2019. At L.C.'s request, however, the proceedings were delayed until February 2020, shortly before L.C. turned twenty-one. After the Commonwealth re-commenced the Act 21 proceedings, L.C. filed his petition for early termination. Under these specific circumstances, we conclude that the petition for early release was merely a preliminary ruling incorporated into the existing Act 21 proceedings. **See** Juvenile Court Opinion, 9/10/20, at 9 (concluding that it would be reckless to release L.C. prior to Act 21 hearing). That said, we still find no basis to provide L.C. with relief.

While no party has raised or addressed this issue, we find L.C.'s attempt to effectively seek reversal of his petition for early termination of juvenile court supervision mooted or, at a minimum, necessarily subsumed by his attack on the order involuntarily committing him pursuant to 42 Pa.C.S.A. § 6403(d). Stated differently, L.C.'s petition attempted to terminate the juvenile court's supervision early and occurred prior to any adjudication of the need for involuntary treatment. Furthermore, L.C. reached the age of majority a few weeks after his petition was filed. Unambiguously, "the juvenile court terminated supervision of [L.C.]," Juvenile Court Opinion, 9/10/20, at 3; **see also** Appellant's Brief, at 10, so we are unable to determine what possible relief we could grant L.C. for this claim on appeal.

Even if we were to consider the substantive components of his claim, his challenge would fail. As L.C. sought early termination under Pennsylvania Rule of Juvenile Court Procedure 632, which does not require the conditions of probation to be satisfied, the court must find there to be "compelling reasons to discharge the juvenile." Pa.R.J.C.P. 632(F). As **D.C.D.** makes clear, a court should, when faced with a Rule 632 motion, consider community protection, accountability, and rehabilitation when making its determination. **See** 171 A.3d at 741. We are satisfied that the juvenile court adequately considered these factors in making its decision and find no abuse of discretion.

In support of his petition for discharge, L.C. presented to the court that he was arrested on adult charges multiple times while at his South Mountain placement. L.C. further indicated that he was not receiving adequate treatment. Further, he claimed he had exhausted all pathways to success in the juvenile justice system and noted that he had spent more time in placement than the corresponding prison sentence of an adult convicted of the same crime.

However, in its opinion, the juvenile court emphasized that "there were no treatment centers, plans, or stepdown services proposed or put into place for [L.C.] upon termination of court supervision." Juvenile Court Opinion, 9/10/20, at 8. At the hearing and after considering all relevant testimony, the court concluded that no one could reasonably believe that L.C.'s treatment was complete. **See** N.T., Early Termination of Court Supervision Hearing,

2/24/20, at 39. The court acknowledged L.C.'s successes and his length of time spent in the juvenile system, but still found L.C.'s emotional and behavioral progress to be incongruous with release into the general community.

In fact, the court saw the inherent dangers in releasing L.C. back into the community at large given his undeveloped emotional skills, pending adult charges, and continuing propensity to commit crimes. Additionally, the court found it to be "reckless" to terminate L.C.'s court supervision prior to his Act 21 hearing and on the eve of his twenty-first birthday. Juvenile Court Opinion, 9/10/20, at 9. The court reasoned that keeping L.C. "in the juvenile system and proceeding to the Act 21 hearing ensured that he was in a place where he could receive necessary psychiatric and psychological resources, and ensured the protection of the community." *Id*.

We find the juvenile court's rationale to be sound and further note the dissimilarities between this case and **D.C.D.** First, given the juvenile's age in **D.C.D.**, Act 21 was not referenced nor implicated.

Second, **D.C.D.** involved an affirmative finding by the juvenile court that early termination of court supervision was necessary and within the best interests of the juvenile and community at large. **See** 171 A.3d at 729. The Supreme Court of Pennsylvania did not create a new legal rule, it merely affirmed the discretion exercised by the juvenile court. Here, in contrast, the

juvenile court exercised its discretion to deny early termination. This procedural distinction weakens **D.C.D.**'s relevance to the present matter.

Third and most importantly, **D.C.D.** involved a specific situation where the juvenile "needed a new placement immediately that could meet his therapeutic needs, and the only placement available required discharge of delinquency supervision." **Id**., at 742 (citation omitted). In other words, **D.C.D.** did *not* result in that juvenile no longer receiving treatment. Instead, our Supreme Court recognized the juvenile court's finding that termination of delinquency supervision was the sole pathway to obtain continued treatment.

Conversely, although conceding that he did not make adequate progress under his placements, L.C. has not, either during his hearing or now on appeal, proposed any alternative channel to address his rehabilitative needs. Accordingly, **D.C.D.** does not compel early termination here, and L.C. is due no relief on this claim.

L.C. next asserts that the Commonwealth failed to adduce clear and convincing evidence that L.C. required involuntary treatment. Effectively, L.C. is raising a sufficiency of the evidence claim in the context of his Act 21 hearing. Our Court has clarified that Act 21 requires the Commonwealth to bear the burden, by clear and convincing evidence, in demonstrating that the respondent suffers from a mental abnormality that results in an unacceptable risk of recidivism:

> at the [Act 21] hearing, it is the Commonwealth that bears the
> burden of showing by clear and convincing evidence that the

- 9 -

person has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence. If the Commonwealth meets this burden, the court is to enter an order committing the person to inpatient treatment for a period of one year. Our Supreme Court has defined clear and convincing evidence as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. Thus, the clear and convincing evidence test has been described as an intermediate test, which is more exacting than a preponderance of the evidence test, but less exacting than proof beyond a reasonable doubt. Moreover, in conducting a sufficiency review, we must consider the evidence in the light most favorable to the Commonwealth, which prevailed upon the issue at trial. With regard to sexually violent predator assessments, the task of the Superior Court is one of review, and not of weighing and assessing evidence in the first instance.

*In re J.C.*, 232 A.3d 886, 894 (Pa. Super. 2020) (*en banc*) (internal quotations, citations, brackets, and alterations omitted).

L.C. refutes the juvenile court's findings by attempting to controvert the SOAB expert's conclusions. Namely, L.C. implies that because she based her conclusions exclusively on L.C.'s paper records, the SOAB expert was without a complete clinical record and could not have opined that he suffered from two paraphilic disorders considered to be Act 21 mental abnormalities. In other words, L.C. contends that since no other treating therapist or medical professional ever concluded that he suffered from those two conditions, there is an inherent contradiction in the record, and the SOAB expert's determinations should not have been used against him.

Preliminarily, we note that L.C.'s brief is woefully deficient in exploring or supporting his sufficiency argument. In fact, after omitting his replication

of our Court's standard of review, his entire contention spans only two paragraphs consisting of five sentences. However, even in overlooking this glaring deficiency, we find that L.C.'s sufficiency averment fails.

Act 21 effectively provides a bridge between the juvenile system and adult system wherein there is an adjudicated need for a juvenile's treatment and involuntary commitment beyond twenty years of age. **See Interest of J.M.G.**, 229 A.3d 571, 580-81 (Pa. 2020). Act 21 establishes three criteria for the Commonwealth to seek a court-ordered commitment by clear and convincing evidence: 1) there must have been an adjudication of delinquency for a specific act of sexual violence as defined by the statute; 2) the juvenile must have been committed to an institution and remain committed there upon reaching the age of twenty; and 3) the juvenile must require involuntary treatment due to a mental abnormality or personality disorder that makes it difficult for that juvenile to control, yet likely to engage in, sexually violent behavior. **See** 42 Pa.C.S.A. § 6403(a). Although unclear, it appears that L.C. seeks to challenge the third criterion: whether L.C. suffered from a mental abnormality. **See** 42 Pa.C.S.A. § 6402 (defining mental abnormality as a "congenital or acquired condition of a person affecting the person's emotional or volitional capacity[]").

In addition to the elements defining a person subject to this statute, the procedures for initiating court-ordered involuntary commitment are clearly enumerated as well. **See** 42 Pa.C.S.A. § 6403(b). First, the SOAB assesses an

individual and presents those findings to the juvenile court. **See id**., at § 6403(b)(1). The juvenile court then makes the determination as to whether a *prima facie* case has been presented such that the individual is in need of involuntary treatment. **See id**.

If so, the court is to direct the county solicitor to file a related petition seeking involuntary commitment. **See id**. The petition is to include the facts identifying why court-ordered involuntary treatment is necessary and must include the SOAB's assessment. **See id**., at § 6403(b)(2). After that, a hearing is scheduled, which then requires the Commonwealth to demonstrate by clear and convincing evidence that a person has a statutorily significant mental abnormality or personality disorder. **See id**., at § 6403(d). L.C. does not contend that there were any procedural irregularities with his Act 21 proceeding.

We find that there was sufficient evidence for the juvenile court to conclude that L.C. suffered from at least one mental abnormality. The testifying SOAB member was a veteran of many previous Act 21 evaluations. **See** N.T., Act 21 Hearing, 2/26/20, at 6 (indicating that she had, at that point, performed several dozen evaluations). After evaluating the treatment documents at her disposal, consisting of, *inter alia*, post-treatment discharge summaries and police and juvenile justice reports, she unequivocally determined that L.C. was suffering from an Act 21 mental abnormality, was

likely to reoffend, and had tremendous difficulty curbing his sexually dangerous behavior. *See id*., at 13.

L.C. provides no support to refute the idea that it was somehow legally erroneous for the SOAB member to exclusively rely on written reports in making her diagnoses. Unlike the cases cited by L.C. in his brief, which are easily distinguishable if not completely irrelevant, the SOAB member's findings were not premised exclusively on published studies, the existence of a "situational motivating factor," or internal inconsistencies in the Commonwealth's case. *See* Appellant's Brief, at 16.

Instead, the SOAB member was well apprised of L.C.'s tendencies to be inappropriate and ascertained that he would, with a high degree of likelihood, be more dangerous as time progressed. *See* N.T., Act 21 Hearing, 2/26/20, at 10, 13-14. The SOAB member concluded that L.C.'s actions were consistent with two separate mental abnormalities and that L.C. continued to engage in unacceptable behavior even in the most restrictive environments. *See id*., at 10. Further, the SOAB member aligned specific incidences documented in L.C.'s reports with the definitional or behavioral elements of the mental abnormalities she considered L.C. to have. *See id*., at 7-14. Ultimately, the juvenile court found the SOAB member to be credible, and in considering the evidence in a light most favorable to the Commonwealth as the prevailing party, we see no compelling reason to contradict the juvenile court's finding that L.C. required involuntary commitment.

As neither of L.C.'s issues merit relief, we affirm the order involuntarily committing him for a period of one year.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/21