J-S30036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.S., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1201 EDA 2025 |

Appeal from the Dispositional Order Entered April 29, 2025
In the Court of Common Pleas of Monroe County
Juvenile Division at No(s): CP-45-JV-0000138-2024

BEFORE: OLSON, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.: **FILED SEPTEMBER 12, 2025**

M.S. appeals from the dispositional order that, *inter alia*, revoked his probation and placed him at the North Central Secure Treatment Unit ("North Central") located in Danville, Pennsylvania. M.S. presents four issues for review, principally contending that the court's out-of-home placement determination was not the least restrictive means to serve his best interests. We affirm.

As recounted, at length, by the trial court:

[M.S.] is a fifteen-year-old high school student who is a resident of Monroe County. The [initial] incident giving rise to this case occurred at Lehman Intermediate School, located in Pike County. Specifically, on April 29, 2024, [M.S.] attacked another student in the school's main office. [M.S.] struck the student several times on the head, attempted to wrestle him to the ground, and

_____

[*] Retired Senior Judge assigned to the Superior Court.

ultimately had to be pulled off the student by a school administrator. As a result, [M.S.] was charged by Pike County officials with [s]imple [a]ssault. At the adjudication hearing on July 17, 2024, [M.S.] made a voluntary, counseled admission to [s]imple [a]ssault, a misdemeanor of the second degree. As part of the admission, [M.S.] and his Pike County attorney signed the required [j]uvenile [a]dmission [f]orm. On the same day, the Court of Common Pleas of Pike County entered an [o]rder accepting the admission, finding [M.S.] in need of treatment, supervision, or rehabilitation, adjudicating [M.S.] delinquent, and transferring the case to [the Court of Common Pleas of Monroe County] for disposition.

Upon formally receiving the transfer, [the trial court] scheduled a disposition hearing. Prior to the hearing, [Monroe County's] Juvenile Probation Department ("Probation") completed a Youth Level of Service ("YLS") Assessment and prepared both a corresponding YLS Assessment Report ("First YLS Assessment Report") and a Dispositional Hearing Memo ("Disposition Memo"). . . .

[M.S.] and his father failed to report to the YLS interview. [M.S.'s] father refused to answer his cell phone or respond to text messages and voicemails. Therefore, the assessment was completed based on [M.S.'s] academic records and information Probation had learned while supervising [M.S.'s] older brother since December 2023.

[M.S.] resides with his father, who has consistently been argumentative and uncooperative in dealing with Probation on matters related to both [M.S.] and his brother. The children have no known relationship with their mother.

[M.S.'s] academic records indicated that he had been held back at the end of the prior school year due to his accumulating 90 unlawful absences and failing all core academic courses. Further, [M.S.] had been involved in the following incidents, which were handled internally by the school: a minor altercation in September 2019 resulting in a three-day suspension; fighting and disorderly conduct in February 2020 resulting in a ten-day suspension and Manifestation Hearing; theft in February 2020 resulting in one day of suspension; fighting in October 2022 resulting in a ten-day suspension; fighting in September 2023 (discipline, if any, unreported); and possession/use of marijuana product in March

2024[,] resulting in a referral to the Student Assistance Program, Health Assessment, and Restrictive Movement. The records also indicated that [M.S.] had entered into a Partial Hospitalization Program through Colonial Intermediate Unit 20 when he was ten years old. Finally, the records indicated that on May 24, 2024, a few weeks after the underlying incident in this case, [M.S.] was transitioned into a Therapeutic Emotional Support classroom with the Life Skills Program.

On September 20, 2024, the disposition hearing was convened. [M.S.] was represented by an attorney from the Monroe County Public Defender's Office. At the conclusion of the hearing, and based on [the court's] review of the transfer documents, the First YLS Assessment Report, and the Disposition Memo, [the court] issued an order placing [M.S.] on probation for an indefinite period, subject to review in accordance with the Juvenile Act. In the [o]rder, [the court] made findings required by applicable provisions of the Juvenile Act and the Rules of Juvenile Court Procedure. [The court] specifically found that, at the time, probation was the least restrictive consequence that would provide balanced attention to the protection of the community, the imposition of accountability for offenses committed, and the development of competencies to enable [M.S.] to become a responsible and productive member of the community.

Unfortunately, [M.S.'s] problematic conduct and behaviors, including the failure to attend school, disciplinary incidents at school, the resort to violence at school and in the community, and use of marijuana, continued.

On November 8, 2024, [M.S.] was involved in a fight in his school's bathroom. The incident resulted in a summary citation issued for [d]isorderly [c]onduct by the school police officer.

On November 20, 2024, an Individualized Education Program (["]IEP["]) meeting was held to review [M.S.'s] educational placement. Throughout the meeting, [M.S.] was extremely rude, defiant, and disrespectful to all participants and was restrained after placing his hands on his probation officer. As a result of the review, and after finding that [M.S.] had exhausted the resources of his current school, [M.S.] was educationally placed at Colonial Academy, an alternative school located in Northampton County that is operated by the regional Intermediate Unit. [M.S.] entered Colonial Academy on December 9, 2024.

On March 7, 2025, a dispositional/probationary review hearing was convened. [M.S.] was again represented by an attorney from the Public Defender's Office. At the hearing, the [c]ourt found that [M.S.] was not meeting the terms and conditions of the disposition. The finding was based on [M.S.'s] failure to attend school regularly and his continued use of marijuana. At the conclusion of the hearing, [M.S.] was ordered to remain on probation.

In the Violation Memo[randum], [M.S.'s] probation officer described the conduct of [M.S.] and his father during the review hearing, and the immediate subsequent history, as follows:

> [M.S.] and his father arrived nearly 20 minutes late for his scheduled [d]ispositional [r]eview [h]earing on March 7, 2025. [M.S.'s father] used vulgarities throughout and was repeatedly warned about his language in the [c]ourtroom by Hearing Officer [Syzane] Arifaj. The ongoing issues were brought to the [c]ourt's [attention] with the hope that [M.S.] would realize that if drastic changes were not made, [p]robation [v]iolation proceedings would be initiated and placement into a residential treatment facility would be imminent. The following week in school, [M.S.] vowed to attend school regularly and without incident, along with refraining from illicit drug use. He only attended two school days after the March 7, 2025[ c]ourt appearance and his father related that [M.S.] was not staying in the residence consistently. As a result, a [w]arrant to [c]ommit and [d]etain was issued by [the probation officer] on April 2, 2025.

On April 8, 2025, [M.S.] was involved in a fight inside Wal-Mart in East Stroudsburg, resulting in summary citations for [d]isorderly [c]onduct and [h]arassment issued by the Stroud Area Regional Police Department. As a result of that incident, [M.S.] was taken into custody on the [w]arrant to [c]ommit and [d]etain.

On April 22, 2025, the Monroe County Probation Department filed a [p]etition for [v]iolation of [p]robation. [In that petition, six violations were proffered. *Inter alia*, M.S. was alleged to have failed to follow his probation officer's instructions, failed to comply with all criminal laws, failed to refrain from fighting, and failed to abstain from consumption of prohibited substances.]

On April 28, 2025, a [p]robation [v]iolation [h]earing was convened. [M.S.] made a voluntary, counseled admission to the violations. During the hearing, [M.S.'s] probation officer, Michael Kashner, summarized the violations and introduced the recommendation that [M.S.] be placed at North Central[. *Inter alia*, Officer Kashner conveyed to the court that while many of the requested placement facilities indicated that they could not meet [M.S.'s] medical needs associated with his seizure disorder, North Central was capable of meeting those needs.]

At the conclusion of the hearing, [the court] issued the [d]ispositional [r]eview [o]rder placing [M.S.] at North Central that is being challenged in this appeal. . . .

Trial Court Opinion, 6/17/25, at 1-8 (record citations and footnotes omitted).

M.S. simultaneously filed a timely notice of appeal and concise statement of errors complained of on appeal. Now, before this Court, M.S. raises four issues for review:

1. Did the court err in ordering the out-of-home placement of M.S. where there was not clear and convincing evidence that it was the least restrictive means to serve his bests interests and the protection of society?

2. Did the court err in failing to seek an appropriate placement with reasonable accommodations for M.S.'s disability, i.e., epilepsy, in violation of the Americans with Disabilities Act and against his best interests?

3. Did the court err in ordering M.S.'s placement at North Central in violation of his 14th Amendment equal protection rights because a similarly situated juvenile, with no disability, would have a significantly less restricted placement?

4. Did the court err when it placed M.S. at North Central because the facility deals with his epilepsy whereas the Juvenile Act is concerned with the least restrictive means to treat his delinquency and not simply his medical condition?

***See*** Appellant's Brief at 4.

"Our standard of review of dispositional orders in juvenile proceedings is well settled. The Juvenile Act[, 42 Pa.C.S. § 6301 *et seq.*,] grants broad discretion to juvenile courts when determining an appropriate disposition. We will not disturb the juvenile court's disposition absent a manifest abuse of discretion." **Interest of N.M.**, 311 A.3d 1149, 1152 (Pa. Super. 2024) (cleaned up). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." **Interest of D.J.K.**, 303 A.3d 499, 504 (Pa. Super. 2023) (cleaned up).

Section 6301 establishes that the Juvenile Act should be interpreted in a way that is

> [c]onsistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation[,] which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed[,] and the development of competencies to enable children to become responsible and productive members of the community.

42 Pa.C.S. § 6301(b)(2). Nevertheless, juvenile courts are explicitly directed to use the least restrictive intervention consistent with community protection. **See In Interest of D.C.D.**, 171 A.3d 727, 738 (Pa. 2017) (citing 42 Pa.C.S. § 6301(b)(3)(i)).

The Juvenile Act prescribes a variety of options for placement of a delinquent child, ranging from permitting the child to remain with his or her

parents to committing the child to an institution. *See D.C.D.*, 171 A.3d at 739; *see also* 42 Pa.C.S. § 6352(a) (giving the courts several options when a child is found to be delinquent). Further, Section 6352 provides "when confinement is necessary, the court shall impose the minimum amount of confinement that is consistent with the protection of the public and the rehabilitation needs of the child." 42 Pa.C.S. § 6352(a); *see also* 42 Pa.C.S. § 6352(b)(3) (establishing that courts should attempt to preserve the "family environment whenever possible, separating the child only when necessary for his welfare, safety[,] or health or in the interests of public safety"). However, prior to ordering institutional placement,

> the court shall state its disposition and the reasons for its disposition on the record in open court, together with the goals, terms[,] and conditions of that disposition. If the child is to be committed to out-of-home placement, the court shall also state the name of the specific facility or type of facility to which the child will be committed and its findings and conclusions of law that formed the basis of its decision consistent with subsection (a) and section 6301, including the reasons why commitment to that facility or type of facility was determined to be the least restrictive placement that is consistent with the protection of the public and best suited to the child's treatment, supervision, rehabilitation[,] and welfare.

*Id.* § 6352(c).

Similarly, Pennsylvania Rule of Juvenile Court Procedure 512(D) requires the court, during a dispositional hearing on delinquency matters, to "enter its findings and conclusions into the record" and, if the juvenile is removed from the home, to state in open court, *inter alia*, "why the court found that the out-of-home placement ordered is the least restrictive type of

placement that is consistent with the protection of the public and best suited to the juvenile's treatment, supervision, rehabilitation, and welfare[.]" Pa.R.J.C.P. 512(D)(4)(b); **see also** Pa.R.J.C.P. 512(D)(6)-(7) (requiring the court to also state "any findings necessary to ensure the stability and appropriateness of the juvenile's education" as well as "any findings necessary to . . . address the juvenile's needs concerning health care and disability"). Nevertheless, once removal from the family home is ordered, the juvenile court retains "considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile." **Interest of A.R.A.**, 315 A.3d 877, 881–82 (Pa. Super. 2024) (cleaned up).

M.S. first asserts that the record reflects an absence of "clear and convincing evidence" demonstrating that North Central, as a secure facility, was the least restrictive placement available. Appellant's Brief at 17; **see also** 42 Pa.C.S. § 6301(b)(3)(1) (requiring "evidence-based practices whenever possible"). To emphasize his point, he relies upon the court's statement wherein it expressly disclaimed that there were no other placement options available. **See** N.T. Dispositional Hearing, 4/28/25, at 15 (the court: "[T]here are hundreds of placement facilities. We didn't try hundreds of placements. We tried the ones that we're familiar with, and that we're willing to send young men . . . to because we're not going to just send them to any place without knowing what they're about and having been there."). Separately, M.S. argues that truancy, which he admitted to, is merely a contributing factor, not

- 8 -

dispositive one, for courts to consider in their removal determinations and implicitly contends that truancy was M.S.'s only problem that led to his out-of-home placement. *See* Appellant's Brief at 22; *but see id.* at 23 (highlighting that M.S. admitted to probation violations related to charges stemming from three fights, marijuana use, and sixty-six days of truancy). M.S. also suggests that the court "failed to consider alternate interventions that would have allowed M.S.'s family to remain intact, such as the PATH program or Justiceworks." *Id.* (stating, further, that "[n]o less intensive in-home intervention had been attempted. . . . [A]t the time the court separated M.S. from his father[,] he had not received any in-home services").

M.S. relies on *Interest of D.W.*, an unpublished decision from this Court, for the proposition that remand is warranted given his contention that, like here, "neither [the juvenile] court, nor any participant, specifically addressed least restrictive alternatives [before placing the juvenile at North Central]." 2025 WL 1171185 at *2 (Pa. Super., filed Apr. 22, 2025) (unpublished memorandum) (emphasis omitted) (quoting the trial court opinion). Consequently, we directed the trial court to "conduct a hearing to determine whether [the juvenile's] placement at North Central was the least restrictive alternative." *Id.*

Even assuming *D.W.* carried precedential force, which it does not, the record, here, demonstrates that Officer Kashner stated to the court that he "referred [M.S.] out to four different placement agencies, which is probably

an excess of – of 10 or 12 specific facilities, because most of the agencies [Officer Kashner] referred him out to have a number of different facilities under their umbrella, and none of the facilities felt they could meet his medical needs." N.T. Dispositional Hearing, 4/28/25, at 10. Nevertheless, those operating North Central, cognizant of M.S.'s seizure disorder, had "a bed available for him right now[.]" *Id.* Paralleling Officer Kashner's statements, the Commonwealth did not "see another alternative" for M.S. *Id.* at 14. The court concluded that, based on what it heard and "judging by [M.S.'s] affect . . . and [M.S.'s] father's tirade . . . some of the other options wouldn't be realistic, anyway." *Id.* In its parting message to M.S., the court told him to "[g]ive the placement a chance. There's a lot of services. There's a lot of things available there for you, not only in the medical end of things, but other services as well." *Id.* at 16. Clearly, the court considered, and specifically addressed, the possibility of less restrictive alternatives before determining that North Central was an appropriate placement for M.S. As such, *D.W.* is wholly inapplicable.

As to M.S.'s other arguments that cast doubt on the court's evidentiary basis for determining that an out-of-home placement was necessary, the court wrote as follows:

> [T]he record clearly demonstrates [M.S.'s] current inability to be supervised in the community, his need for a higher level of accountability and supervision, and an even greater need for consistent treatment and rehabilitation beyond that which was available in the home, school, and community settings. Simply, [M.S.] has been unresponsive to [the judicial system's] efforts to

prevent removal from his home.

Since being placed on probation, each of [M.S.'s] most concerning behaviors has continued. [M.S.] continues to exhibit acts of physical and verbal aggression, including putting his hands on his probation officer during a school meeting, engaging in assaultive behavior on multiple occasions, and getting in two fights resulting in summary citations. In addition, [M.S.] continues to abuse marijuana, admittingly self-medicating instead of taking prescribed medication to treat his reported seizure disorder. He also continues to be truant. And, he continues to come and go from his home as he pleases, including staying out all night.

Changes in [M.S.'s] educational placement did not help. Between December 9, 2024, and April 9, 2025, [M.S.] accumulated [fifty-six] school absences and is expected to be held back for the second year in a row. Efforts by his district at adjusting [M.S.'s] behaviors through normal educational and special education processes did not work. Likewise, educational placement in an established alternative school, operated by the regional Intermediate Unit, where a variety of mental, behavioral, and physical health services are available on campus, did not work.

Beyond the failure and inability to adjust to community-based probationary supervision and revised educational and school-based behavioral health modalities, support at home is lacking[,] and [M.S.] will not or cannot follow his father's rules and commands. The record demonstrates, Probation has found, and the [c]ourt has observed that [M.S.'s] father fails or is unable to provide adequate supervision within the family home. In this regard, [M.S.] is frequently out past curfew, and is permitted to stay outside the home, stays outside the home even when not permitted, or both. Additionally, [M.S.'s] father undermines probationary rehabilitative efforts and has been uncooperative with both Probation and Monroe County Children and Youth Services ("CYS"). [M.S.'s father] also condones [M.S.'s] history of resorting to violence, as evidenced by the father telling [the court], with respect to one of his son's fights, "If the kid came up to me when I was young, I'd beat his ass too. Excuse my French. It's the way it is."

Simply, by his words and actions[, M.S.] demonstrated that he is not amenable to community-based supervision and is in need of a placement that has the level of restriction, as well as the

programs, personnel, and resources, sufficient to meet his needs.

Trial Court Opinion, 6/17/25, at 10-12 (record citations and footnote omitted).

In consideration of, *inter alia*, M.S.'s history, familial situation, and repeated transgressions, culminating in *six* probation violations, the court concluded that

> [t]he out-of-home placement was necessary and in conformity with [the Juvenile Act's] mandates because [M.S.] had become out-of-control and assaultive, his actions presented a danger to himself and others, he had failed or refused to engage in treatment and counselling, he was chronically truant, and he failed to recognize authority. . . .

> [The court] further determined that placement at North Central, a state[-]operated facility with which [it was] familiar, that has programs particularly suited to the rehabilitative needs of [M.S.], that can provide necessary competencies, that can provide a proper measure of accountability, that can objectively perform risk analyses and assess [his] progress, that can meet [his] medical needs, and that can accomplish all of this in a setting that provides safety for the public and [M.S.], was the most appropriate placement[.] . . .

*Id.* at 12-13. The court also decided that North Central "was the least restrictive placement that could meet [his] rehabilitative needs . . . while keeping both [him] and the public safe." *Id.* at 14 (stating, further, that the court was not required "to place a child in an open program before ordering him . . . to a secure program[]").

Following our review of the record, we discern no abuse of discretion by the trial court. The certified record confirms that, consistent with sections 6301(b) and 6352, it thoughtfully and thoroughly considered the specific circumstances of this case, which included the particularities surrounding

- 12 -

M.S.'s home life, M.S.'s medical and rehabilitative needs, and the public's need for protection. Based on those considerations, it then ordered the least restrictive appropriate placement. Clearly, M.S.'s at-home placement, both prior to and after being placed on probation, did not work for him in achieving any kind of measurable progress; his behavior throughout the life of this case evidences a status quo of repeated wrongdoing. When coupled with Officer Kasher's statements to the court establishing that none of the other facilities in contemplation could provide M.S. with the medical care that he needed, North Central was the least restrictive placement that was available and appropriate.[1] Indeed, North Central was the *only* placement the court deemed appropriate after considering the available options, thereby rendering it the least restrictive, by definition. Accordingly, M.S. is due no relief on this claim.

In his second issue, M.S. suggests that the court violated the Americans with Disabilities Act ("ADA") because it did not seek a "least restrictive" placement able to accommodate his disability. *See* Appellant's Brief at 27. He argues that he should be entitled to "the same services or facilities that would be provided to a non-disabled individual" unless the service provider's adherence is unreasonable. *Id.* at 29. He concludes that, when the court

_____

[1] We note that M.S., points to no authority establishing that a court must consider the particularities of every possible placement, and we have found none. Indeed, the court acknowledged the existence of hundreds of possibilities within this Commonwealth before identifying, in its view, the only appropriate one.

indicated that some of the less restrictive placements would not be realistic, "[b]y necessary implication, some less restrictive placements would have been appropriate but were ruled out by the [c]ourt simply because of [M.S.'s] epilepsy." *Id.* at 30 (emphasis omitted).

Preliminary, we note M.S.'s argument on this issue is unclear. As best we can discern, M.S. does not contend that North Central is in noncompliance with the ADA. Instead, he avers that his epilepsy rendered his placement at North Central *fait accompli*, even though the court insinuated that other unexplored placement possibilities existed.

With regard to this claim, the court noted that it

placed [M.S.] at North Central for [the myriad other reasons it relied on], not solely because it could accommodate his disability. Specifically, [the court] placed him there because [it] determined that a secure setting was necessary, because the program could provide the accountability treatment, supervision, and rehabilitation [M.S.] required, because the program offered safety and security for [M.S.] as well as the public, **and** because the program could accommodate [his] medical needs.

To be sure, during the violation hearing[, M.S.'s] probation officer stated that, in investigating potential placements, he had contacted the secure detention center with which Monroe County has a contract as well as several other private juvenile providers. The providers, which operate both secure and non-secure programs, are well known to the [c]ourt. None would accept [M.S.] in either open or secure programs because of his epilepsy. CYS also investigated potential placements with the same results. But that is not why [the court] deemed a secure placement facility necessary and is not the basis for placing [him] at North Central.

During the violation hearing, after hearing from [M.S.'s] probation officer, the Commonwealth, and counsel for [M.S.], and while considering placement options and recommendations, [the court] indicated that, "some of the other options wouldn't be realistic,

- 14 -

anyway." [The court's] statement could and perhaps should have been clearer and more specific. What [it] determined and what [it] meant is that, under the facts and circumstances of his case, a secure placement setting was necessary[,] and an open placement was not realistic. Stated differently, given [M.S.'s] continued overt and assaultive conduct, his coming and going as he pleases, including his failure and refusal to abide by curfews and directives to stay at home, his marijuana usage, his lack of respect for authority and flaunting of rules at home, at school, and in the community, and his lack of support in his home, [the court] would not have found a non-secure placement to have been suitable, appropriate, or "realistic" even if an open program that would have accepted [M.S.] had been identified.

Trial Court Opinion, 6/17/25, at 16-17 (record citations omitted; emphasis in original). In short, it was M.S.'s "conduct, actions, and behaviors, not his epilepsy or discriminatory or unequal treatment by the entities who have tried to help him, that made the efforts to avoid placement futile[.]" *Id.* at 17.

We, again, discern no abuse of discretion in the court's decision to place M.S. at North Central. M.S. failed to demonstrate any discrete ADA violation, either perpetrated by the court or predicated on the placement location, when juxtaposed against the court's determination that North Central could meet his particularized medical needs. To the extent that M.S. suggests other providers are not in compliance with the ADA, that issue is not before this Court. Nevertheless, contrary to M.S.'s argument, there is no indication that the court "provide[d] a different service or facility to a disabled individual that is not the equivalent of a facility to the non-disabled." Appellant's Brief at 30. Moreover, M.S. has pointed to no evidence establishing that North Central *only* treats those with recognized disabilities. As M.S. failed to establish any

ADA violation under these facts and circumstances, M.S.'s allegation necessarily fails.

M.S. next raises an equal protection claim, ostensibly under the Fourteenth Amendment to the United States Constitution,[2] asserting that the court ignored less restrictive placements because of his disability. Conversely, M.S. suggests that "[a] person without [his] disability would have been placed in a less restrictive placement." *Id.* at 35. M.S. then maintains that the court discriminated against him "not on the basis of [his] treatment needs, but only based upon the court's familiarity with the programs, as the court acknowledged that some lesser treatment placements would have been able to accommodate [him]." *Id.*[3]

In its opinion, the court asserts that M.S.'s equal protection claim is waived because it is being "raised for the first time on appeal," Trial Court

_____

[2] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

[3] M.S.'s entire equal protection argument is rather unclear and undeveloped. Preliminarily, there is at least some ambiguity in whether M.S. is suggesting that he was treated differently vis-à-vis *all* juveniles facing out-of-home placement or, given his first unqualified usage of the word "treatment," adjudicated differently as compared to other juveniles with recognized health-related disabilities requiring some level of medical support. Assuming his argument to be the former, that he was treated differently as compared to the general population of juveniles, M.S.'s contention that he received disparate treatment *based on* his disability is wholly undercut by his concession that the out-of-home treatment decision was made due to the court's established familiarity with North Penn rather than any other exogenous reason, such as his epilepsy.

Opinion, 6/17/25, at 18, and, in any event, is substantively frivolous. M.S., in response, asserts that, although the phrase "equal protection" was never mentioned during the dispositional hearing, "the claim was sufficiently raised [and therefore preserved] by [his] objection to [him] not being treated the same as similarly situated juveniles." Appellant's Brief at 33.

Assuming, *arguendo*, the issue not to be waived, other than the court confirming that North Penn could provide adequate medical support for his epilepsy, there is nothing of record to demonstrate that M.S. was treated disparately, particularly in a way that would adversely impact him, *because of his disability* or that the court's consideration of placement opportunities and their derivative abilities to meet his medical needs is violative of the Constitution.[4] As such, juxtaposed against the undeveloped nature of his argument, M.S. has failed to demonstrate the existence of an equal protection violation. *Cf. Small v. Horn*, 722 A.2d 664, 672 (Pa. 1998) ("The Equal Protection Clause . . . does not obligate the government to treat all persons identically, but merely assures that all similarly situated persons are treated

_____

[4] When addressing an equal protection claim, we typically apply one of three levels of scrutiny: strict scrutiny to the restriction of a fundamental right; intermediate scrutiny to the restriction of an important but not fundamental right; and rational basis review in all other instances. *See William Penn Sch. Dist. v. Pennsylvania Dep't of Educ.*, 170 A.3d 414, 457-58 (Pa. 2017). M.S. failed to provide any discussion into which level of scrutiny applies to his underlying equal protection argument, which has necessarily impeded our review.

alike."). Nevertheless, we emphasize that the record reflects that the court methodically considered all of the relevant information and reached a conclusion that placement at North Central was the best placement that would suit M.S. consistent with the dictates of the Juvenile Act.

Finally, M.S. maintains that he was placed at North Central based on his disability, which circumvented the purpose of the Juvenile Act. Specifically, M.S. claims that the court "prioritize[d his] treatment for epilepsy over his family connections[] without considering how that treatment could be accomplished from home or a less restrictive placement[.]" Appellant's Brief at 38.

Following our review, although we agree that the Juvenile Act's mission is to preserve the family whenever possible, the court did not disregard this mandate and prioritize M.S.'s treatment needs over his family connections. Instead, we note that M.S. was initially placed on probation, allowing him to continue living with his family. Thereafter, when he engaged in multiple violations of that probation, the court found that continued placement in his home was untenable. Although the court considered, as it must, M.S.'s "needs concerning [his] health care and disability[,]" Pa.R.J.C.P. 512(D)(6), there is nothing of record to suggest that the court decided placement at North Central was the singularly appropriate outcome based *solely* on his epilepsy. Indeed, the court's placement decision reflects a well-reasoned and thorough review of M.S.'s needs and the various placement options considering the

requirements of the Juvenile Act.

After reviewing all four of his claims, M.S. has not established that the juvenile court's disposition order was "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." ***D.J.K.***, 303 A.3d at 504 (cleaned up). In failing to meet his burden, we therefore have no cause to disturb the court's decision to place M.S. at North Central. Simply put, less-restrictive supervision, which includes, for instance, M.S.'s time spent at home while on probation, was not effective at preventing further delinquent acts or otherwise rehabilitating him, and the court made the requisite findings, considering the Juvenile Act, to ascertain that North Central was the least restrictive placement capable of supporting M.S.'s needs.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2025

- 19 -